CHARLES PATTERSON, APPELLANT, *v.* EDMUND P. GAINES AND WIFE.*

The opinion of this court in the case of Gaines *v.* Relf and Chew, (2 Howard 619,) reviewed.

A court of equity can decide the question whether or not a party is the heir of a deceased person. It is not necessary to send the issue of fact to be tried by a court of law.

Where a marriage took place in Pennsylvania, it must be proved by the laws of Pennsylvania. In that State it is a civil contract, to be completed by any words in the present tense, without regard to form. and every intendment is made in favor of legitimacy.

Where the complainant in a bill offers to receive an answer without oath, and the defendant accordingly filed the answer without oath, denying the allegations of the bill, the complainant is not put to the necessity, according to the general rule, of contradicting the answer by the evidence of two witnesses or of one witness with corroborating circumstances. The answer, being without oath, is not evidence, and the usual rule does not apply.

In this case, however, even if the answer had been under oath and had denied the allegations of the bill, yet there is sufficient matter in the evidence of one witness, sustained by corroborating circumstances, to support the bill.

A marriage may be proved by any one who was present and can identify the parties. If the ceremony be performed by a person habited as a priest, and *per verba de presenti,* the person performing the ceremony must be presumed to have been a clergyman.

If the fact of marriage be proved, nothing can impugn the legitimacy of the issue, short of the proof of facts showing it to be impossible that the husband could be the father.

By the laws of Louisiana and Pennsylvania, a marriage between a woman and a man who had then another wife living was void, and the woman could marry again without waiting for a judicial sentence to be pronounced declaring the marriage to be void.

If she does so marry again, and the validity of her second marriage be contested, upon the ground that she was unable to contract it because the first marriage was legal, it is not necessary for her to produce the record of the conviction of

---

* Mr. Chief Justice Taney did not sit in this cause, a near family relative being interested in the event.

Mr. Justice McLean did not sit in this cause.

Mr. Justice Catron did not sit in this cause, by reason of indisposition.

her first husband for bigamy. The burden of proof lies upon those who make these objections to the second marriage, and the declarations of the bigamist, that he had a first wife living when he married the second, are evidence.

When, in the progress of a suit in equity, a question of pedigree arises, and there is proof enough, in the opinion of the court, to establish the marriage of the ancestor, the presumption of law is that a child born after the marriage is legitimate, and it will be incumbent on him who denies it to disprove it, although in so doing he may have to prove a negative.

Although the general rule is that a person cannot be affected, much less convicted, by any evidence, decree, or judgment to which he was not actually or in consideration of law privy, yet it has been so far departed from as that wherever reputation would be admissible evidence, there a verdict between strangers in a former action is evidence also.

Although by the code of Louisiana a person holding property by sale from a donee of an excessive donation is liable to the forced heir only after an execution first had against the property of the donee, yet this rule does not apply to cases where the sale was made without any authority, judicial or otherwise.

Where sales are made without this authority, the purchaser is presumed to have notice of it. It is his duty to inquire whether or not the requisitions of law were complied with.

The statute of limitations which was in force when the suit was brought is that which determines the right of a party to sue.

By the Louisiana code of 1808, a deceased person could not, in 1811, dispose of more than one fifth of his property, when he had a child. The child is the forced heir for the remaining four fifths.

THIS was an appeal from the Circuit Court of the United States for East Louisiana.

It was a branch of the case of Gaines and Wife *v.* Chew and others, which is reported in 2 Howard, 619.

In the history of that case it is said (2 Howard, 627), that in 1836, Myra (then Myra Whitney, and now Myra Gaines) "filed a joint bill with her husband, in the Circuit Court of the United States for the District of Louisiana, against Relf and Chew, the executors in the will of 1811, the heirs of Mary Clark, and all the purchasers and occupants of the estate of which Clark died in possession, claiming to be the heir and devisee of Clark, and calling upon them all to account for the rents and profits of the several portions of the estate."

The joint bill, thus filed against a number of persons, was treated differently by the respondents. Some pursued one course and some another. Relf and Chew, the executors, demurred generally, and upon the argument of the demurrers, some questions arose upon which the judges differed in opinion. These questions were consequently certified to the Supreme Court, and the answers to them constitute the case reported in 2 Howard, 619. Patterson was one of the occupants and purchasers of a part of the property of which Clark died seized, and he chose to answer the bill. The proceedings of the court under this answer are now under consideration.

The history of Zuline Carriere, the mother of Mrs. Gaines, is briefly given in 2 Howard, 620, and need not be repeated. The facts are there stated, of her marriage with a man by the

name of De Grange; of her afterwards learning that De Grange had a former wife living; of her separation from him and journey to New York to obtain proofs of this first marriage of De Grange; of De Grange's first wife arriving in New Orleans from France; of De Grange being committed to prison on a charge of bigamy, and subsequent escape from the country; of Clark's marriage with Zuline in Philadelphia; of the birth of Myra, the complainant in the present suit; of Clark's placing her in the family of Mr. and Mrs. Davis; of the circumstances attending the making of the will of 1811; and some of the testimony relating to a subsequent will made in 1813, leaving all his property to his daughter Myra. The statement of these things in 2 Howard is referred to, as being a more particular narrative than the mere outline which is here given. We propose to take up the case where that report left it.

·The record in the present case was in a very confused condition. Papers were misplaced, and the entire record of proceedings in the Court of Probates, from 1834 to June 8, 1836, was introduced as evidence by the defendant, Patterson, in the Circuit Court; and also the proceedings of that court at a much earlier date. From them the following facts appear.

Clark died on the 16th of August, 1813. On the 18th of August, two days afterwards, the following petition was presented to the Court of Probates.

To the Honorable the Judge of the Court of Probates of the
　　　　Parish of New Orleans.

The petition of Francisco Dusuau de la Croix, of this parish, planter, respectfully shows:

That your petitioner has strong reasons to believe, and does verily believe, that the late Daniel Clark has made a testament or codicil, posterior to that which has been opened before your honorable court, and in the dispositions whereof he thinks to be interested. And whereas it is to be presumed that the double of this last will, whose existence was known by several persons, might have been deposited with any notary public of this city.

Your petitioner, therefore, prays that it may please your Honor to order, as it is the usual practice in such cases, that every notary public in this city appear before your honorable court within the delay of twenty-four hours, in order to certify on oath if there does or does not exist, in his office, any testament or codicil, or any sealed packet, deposited by the said late Daniel Clark.

And your petitioner, as in duty bound, will ever pray, &c.
　　　(Signed,)　　　　　　　　　　　D. Seghers,
　　　　　　　　　　　　*Of Counsel for the Petitioner.*

Francisco Dusuau de la Croix, the above petitioner, maketh oath that the material facts in the above petition set forth are true, to the best of his knowledge and belief.

(Signed,)　　　　　　　　DUSUAU DE LA CROIX.

Sworn to before me, August 18th, 1813.

THOS. BEAL, *Reg. Wills.*

The court ordered the notaries of the city to appear before it on the next day, when seven appeared and deposed that no testament nor codicil, nor sealed packet, had been deposited in their office by the late Daniel Clark, nor had any deposition, *mortis causa,* been made by him.

The will of 1811 was then admitted to probate. It was as follows:—

Daniel Clark. In the name of God: I, Daniel Clark, of New Orleans, do make this my last will and testament.

Imprimis. I order that all my just debts be paid.

Second. I leave and bequeathe unto my mother, Mary Clark, now of Germantown, in the State of Pennsylvania, all the estate, whether real or personal, which I may die possessed of.

Third. I hereby nominate my friends, Richard Relf and Beverly Chew, my executors, with power to settle every thing relating to my estate.

(Signed,)　　　　　　　DANIEL CLARK.

Ne varietur. New Orleans, 20th May, 1811.

J. PITOT, *Judge.*

Letters testamentary were granted to Relf on the 27th of August, 1813, and to Chew on the 21st of January, 1814, the latter being absent from New Orleans at the time of Clark's death.

Davis had removed to the North, with his family, in 1812, carrying with him Myra, who passed for his daughter and bore his name.

Things remained in this condition until 1832, when Myra married William Wallace Whitney, and about the time of her marriage became acquainted with her true name and parentage.

In 1834, Whitney and wife commenced a series of proceedings in the Court of Probates, which continued until the 8th of June, 1836, when the court dismissed their petition. It has been already stated, that this entire record was introduced into the case now under consideration by the defendant, Patterson, on the 13th of August, 1840. Many depositions were taken, which constitute a part of the mass of evidence in the case, although some of the witnesses were reëxamined under the authority of a commission issuing from the Circuit Court

of the United States, after the filing of the bill. They who were thus reëxamined were Harriet Smith, *alias* Harper, Madame Caillaret, the sister of Zuline, Belle Chasse, and De la Croix. They whose depositions were not taken over again were Bois Fontaine, Mr. and Mrs. Davis, Pitot, Derbigny, Madame Benguerel, and Preval. The evidence of Madame Despau, another sister of Zuline, was only taken once, and then under a commission issuing from the Circuit Court.

It is not necessary to give a particular narrative of the proceedings before the Court of Probates, from 1834 to June, 1836. They were commenced in March, 1834, by a petition filed by Charles W. Shaumburg for letters of administration upon the estate of Clark, on the ground that the succession was in an unclaimed and abandoned condition, and that he had an interest in the settlement of the same. This petition was opposed by Relf and Chew. On the 18th of June, 1834, Whitney and wife became parties, by filing a petition praying that the will of 1811 might be annulled and set aside, that Myra Clark Whitney might be declared to be the heir of Clark, and that Relf and Chew might be ordered to deliver over the estate to her, &c.

On the 14th of January, 1835, Relf and Chew filed an answer to this petition, denying that Myra had any claim; that Clark was ever legally married, or that he ever had any legitimate offspring; and denying all the other allegations generally.

In the course of this controversy many depositions were taken.

On the 8th of June, 1836, the Court of Probates pronounced its judgment, nonsuiting the plaintiffs.

On the 28th of July, 1836, Whitney and wife filed a bill on the equity side of the Circuit Court of the United States, against Relf and Chew, the executors under the will of 1811, against the heirs of Mary Clark, and all the occupants and purchasers of the estate of which Clark died in possession. The bill charged that the will of 1813 was fraudulently suppressed, that its existence and suppression were notorious, and that all the purchasers did, in their consciences, believe that the will of 1811 had been fraudulently admitted to probate. It moreover stated the whole case, of which an outline has been given, alleging, also, that the sales made by Relf and Chew were illegally made.

Relf and Chew demurred generally; and also pleaded to the jurisdiction of the court. The proceedings in that branch of the case are set forth in 2 Howard, 619. Other defendants pursued other measures of defence, which it is not now necessary to mention.

On the 12th of December, 1837, Whitney's death was suggested, and the suit continued in the name of Myra alone.

On the 24th of May, 1839, Edmund P. Gaines and Myra, his wife, filed a supplemental bill, stating their intermarriage, and praying that the suit might be continued in their joint names as complainants.

On the 18th of April, 1840, the complainants filed an amended bill, praying that Caroline de Grange, and her husband, John Barnes, might be made defendants to the original bill.

On the 21st of April, 1840, Patterson filed his answer, which was not under oath, but signed by his counsel, in conformity with the waiver of the complainants. The answer denied all right and title of the complainants in and to the following described piece or lot of ground situated on Philippa Street, between Perdido and Poydras Streets, having front, on Philippa Street, one hundred and twenty-five feet French measure, by seventy feet in depth, the same being in a square of ground situated in Suburb St. Mary, of this city, now the second municipality of New Orleans, and bounded by Philippa, Circus, Perdido, and Poydras Streets.

It alleged that the property belonged to Clark in his lifetime, and was legally sold by Relf and Chew, his executors, and denied all the allegations of the bill.

On the 25th of April, 1840, Patterson filed the following supplemental answer : —

"The supplemental answer of Charles Patterson, one of the defendants in the above-entitled suit, most respectfully represents : —

"That the property described in his original answer is ninety feet in depth, instead of seventy-five, French measure, as therein stated, and further represents that your respondents purchased a part of said property from Gabriel Correjollas, and the remainder from Etienne Meunier, and that the said Meunier purchased from the said Correjollas, and the said Correjollas purchased all the said property at an auction sale made in the year 1820 by the testamentary executors of the late Daniel Clark, all of which facts will more fully appear from the four several copies of the authentic deed of sale hereunto annexed as a part of this supplemental answer. And this respondent prays that this supplement be made a part of his original answer."

To this answer the deeds referred to were attached as exhibits.

As the claim of Mrs. Gaines in the present case was made, not as devisee under the will of 1813, but as forced heir under the Civil Code of 1808, ch. 3, sec. 1, art. 19, which prohibits a testator from willing away more than one fifth of his property if there is a legitimate child living at the time of his death, it is only necessary to insert in this statement such of the depositions as have a bearing upon the marriage of Clark, and the consequent legitimacy of his daughter Myra.

Madame Despau and Madame Caillaret were sisters of Zuline, and examined under a commission issuing from the United States court.

Their evidence was as follows.

Interrogatories to be propounded, on behalf of Complainants, to John Sibley, Madame Caillaret, Madame Despau, and Mrs. Eliza Clark.

1st. Were you, or not, acquainted with the late Daniel Clark of New Orleans?

2d. Was the said Daniel Clark ever married? if so, when and to whom, and was there any issue of said marriage? State all you may know or have heard of said Clark upon this subject.

3d. Were you acquainted with a man in New Orleans by the name of De Grange? if so, when and where have you known him? Was he, or not, married when he first came to New Orleans, and did he, or not, so continue until after he finally left it? State all you may know or have heard touching this subject.

4th. If you know any thing further material to the complainants in the controversy, state it.

### Cross-interrogatories.

1. Will you and each of you answering any interrogatories of the complainants state your age, employment, and present residence, and if a married woman state your maiden name; and if married more than once state the names of your husbands, and by whom and when and where you resided during each year from 1810 to 1814?

2. If you answer the first interrogatory in chief affirmatively, state how that acquaintance originated. When and where did you first see Mr. Daniel Clark? Was your acquaintance with him intimate or not? Was it ever interrupted, and if so, for what reason? Did it continue uninterrupted until the death of Mr. Clark, and if so, how long a period did it embrace? Do you say that your intimacy with Mr. Clark was of such a nature as to enable you to become acquainted with

events in his life which were not disclosed to the entire circle of his acquaintance? and if so, have you a distinct recollection of any such event or events? and state the circumstances which strengthen your memory on this point.

3. Will you state where Mr. Clark resided when in New Orleans? Do you recollect the street and the house? Did he board or keep house? If he boarded, did he also lodge at the same house, and if so, who was the keeper of this house, and what was his or her general character? If he had a house, did he have a housekeeper, and if so, what was his or her general character? Did he reside in New Orleans during the summer months, and if not, where did he go? At whose house did he stop, or whom did he visit? and state what you know of the people whom he visited, and his own standing in society.

4. If, in answering the second interrogatory, you say that Mr. Daniel Clark was ever married, state when, where, and to whom. By what priest, clergyman, or magistrate, and who were the witnesses present? Were you among the witnesses? What other witnesses were present with you? Did you ever see the lady whom you say Mr. Clark married, and if so, what was her personal appearance, her age, and name, and family? Where did she reside before the time you say she was married to Mr. Clark? How long did you know her before that time? Or were you acquainted with her until then? Did not Mr. Clark introduce her to you? State particularly every thing you know in regard to the connection of Mr. Clark with the lady whom you call his wife, and state if she was ever married before or after the time you say she was married to Mr. Clark; if so, when, where, and to whom?

5. Did you ever know that there was any issue of said supposed marriage? if so, who told you? State your means of knowing any thing about this circumstance. What was the name, age, sex, and the time of the birth of the child whose father you say was Mr. Clark? Do you know who nursed and reared this child, and if so, who was the nurse? State, if you please, if you saw the mother shortly after this child was born, and if so, where was she? Did she reside then at the house of Mr. Clark, and if not, why not, and where did she reside? Did Mr. Clark live with her at this time, and were they known generally to the neighbours as man and wife?

6. Was this supposed marriage of Mr. Clark's (if you say he ever was married) public or private? If public, did Mr. Clark introduce his wife to his friends and acquaintances in New Orleans? And if she was not introduced, state why she was not. Or was his marriage private? If so, why was it private? And what circumstances could, or did, probably

induce him to keep that marriage secret from his friends and the public?

7. Do you know Myra C. Whitney, one of the complainants in this controversy? If so, how long have you been acquainted with her? Did either of the complainants inform you, by letter or otherwise, that your testimony would be important to them in this suit? and if so, on what points did they wish you to be prepared?

8. If, in answering the third interrogatory, you say that you were acquainted with a man in New Orleans by the name of De Grange, state, if you please, where and when you first became acquainted with him, in what year. Were you intimate with him, and if so, did this intimacy continue without interruption? Was he born in the city of New Orleans? and if not, where was he born, and how long did he remain in said city? What was his employment? Was he married in New Orleans, or where was he married? Were you present at his marriage? and if so, state when and by whom he was married. Have you ever seen his wife, and if so, what was her personal appearance and age, and what was her name prior to her marriage with De Grange? Did you ever see De Grange's wife and the lady whom you say Mr. Clark married in company together? if so, when and where, and how often? State particularly every thing you know touching said De Grange, his wife, and their connection or relation with Mr. Clark.

9. Did you ever, or not, hear Mr. Clark acknowledge that he had any natural children in New Orleans? and particularly, did you ever, or not, hear him acknowledge two female children, —— the one named Caroline and the other named Myra? And is, or not, that Myra one of the complainants in this case? Did you ever hear him say that he intended to leave by will money or property enough to Myra to take the stain off her birth? If you heard him use such expressions, or those of a similar character, state what you suppose he meant by taking off the stain from the birth of his own legitimate daughter.

10. Will you state who was the mother of the complainant, Myra? And did the mother nurse Myra? if not, why not? Who did nurse her? Did her mother die, and leave her an infant, or was she too sick and too feeble to nurse that child? Did the mother of Myra, the complainant, nurse and raise her, or not? If not, who did? Mention particularly any and all the circumstances on which you found your opinion.

11. If you know when the complainant Myra was born, state the precise date and place, and state if you know by whom and where she was raised, and whose name she bore, and why she bore that name.

12. State, if you please, what are your feelings and affections towards the complainants; whether you are related to or connected with either of them; and if you are, how and in what degree or way, and whether you have any interest in the event of this suit.

13. Will each one of you, answering any of these direct or cross interrogatories, state whether you have seen or examined, read or heard read, any one of them, or copies of them, at any time or place, before you were called upon by the commissioner to answer them? If ay, state when, where, and by whom they were thus so shown or read to or by you, and for what purpose. State, also, each one of you, whether you have had any conversation or correspondence, within the last three or four years, with the complainants, or with either of them, respecting their supposed claims against the estate of Daniel Clark, and if you answer affirmatively, state why, when, and where such conversation or correspondence occurred, and the nature and amount of them so far as your memory will serve you; and wi o was present at such conversations. If you have any letters from the complainants, or from either of them, on the matters referred to in these direct and cross interrogatories, annex them to your answers if possible; and if not possible, state why. If you have preserved and cannot annex them, give true extracts from them, and if that be not possible, state your recollections.

14. What is your maternal language? If not English, do you understand that language perfectly? And if you do not understand English, how have you contrived to answer the foregoing chief and cross interrogatories? Who has translated them to you?

## Answers of Madame Despau.

### Answer to the first interrogatory.

I was well acquainted with the late Daniel Clark of New Orleans.

### Answer to the second interrogatory.

Daniel Clark was married in Philadelphia, in 1803, by a Catholic priest. I was present at this marriage. One child was born of that marriage, to wit, Myra Clark, who married William Wallace Whitney, son of General T. Whitney of the State of New York. I was present at her birth, and knew that Mr. Clark claimed and acknowledged her to be his child. She was born in 1806. I neither knew, nor had any reason to believe, any other child besides Myra was born of that marriage. The circumstances of her marriage with Daniel Clark

were these. Several years after her marriage with Mr. De Grange she heard that he had a living wife. Our family charged him with the crime of bigamy in marrying the said Zuline; he at first denied it, but afterwards admitted it, and fled from the country; these circumstances became public, and Mr. Clark made proposals of marriage to my sister, with the knowledge of all our family. It was considered essential, first, to obtain record proof of De Grange having a living wife at the time he married my sister, to obtain which from the records of the Catholic church in New York (where Mr. De Grange's prior marriage was celebrated) we sailed for that city. On our arrival there, we found that the registry of marriages had been destroyed. Mr. Clark arrived after us. We heard that a Mr. Gardette, then living in Philadelphia, was one of the witnesses of Mr. De Grange's prior marriage. We proceeded to that city, and found Mr. Gardette; he answered, that he was present at said prior marriage of De Grange, and that he afterwards knew De Grange and his wife by this marriage, — that this wife had sailed for France. Mr. Clark then said, "You have no reason longer to refuse being married to me. It will, however, be necessary to keep our marriage secret till I have obtained judicial proof of the nullity of your and De Grange's marriage." They, the said Clark and the said Zuline, were then married. Soon afterwards, our sister, Madame Caillaret, wrote to us from New Orleans that De Grange's wife whom he had married prior to marrying the said Zuline, had arrived at New Orleans. We hastened our return to New Orleans. He was prosecuted for bigamy, — Father Antoine of the Catholic church in New Orleans taking part in the proceedings against De Grange. Mr. De Grange was condemned for bigamy in marrying the said Zuline, and was cast into prison, from which he secretly escaped by connivance, and was taken down the Mississippi River by Mr. Le Briten d'Orgenois, where he got to a vessel, escaped from the country, and, according to the best of my knowledge and belief, never afterwards returned to Louisiana; this happened in 1803, not a great while before the close of the Spanish government in Louisiana. Mr. Clark told us that, before he could promulgate his marriage with my sister, it would be necessary that there should be brought by her an action against the name of De Grange. The anticipated change of government created delay, but at length, in 1806, Messrs. James Brown and Eligeas Fromentin, as the counsel of my sister, brought suit against the name of Jerome de Grange in the city court, I think, of New Orleans. The grounds of said suit were, that said De Grange had imposed himself in marriage upon her at a time when he had living a lawful wife.

Judgment in said suit was rendered against said De Grange. Mr. Clark still continued to defer promulgating his marriage with my sister, which very much fretted and irritated her feelings. Mr. Clark became a member of the United States Congress in 1806. While he was in Congress, my sister heard that he was courting Miss ——* of Baltimore. She was distressed, though she could not believe the report, knowing herself to be his wife; still, his strange conduct in deferring to promulgate his marriage with her had alarmed her; she and I sailed for Philadelphia, to get the proof of his marriage with my sister. We could find no record, and were told that the priest who married her and Mr. Clark was gone to Ireland. My sister then sent for Mr. Daniel W. Coxe, and mentioned to him the rumor. He answered, that he knew it to be true that he (Clark) was engaged to her. My sister replied, it could not be so. He then told her that she would not be able to establish her marriage with Mr. Clark, if he were disposed to contest it. He advised her to take counsel, and said he would send one; a Mr. Smythe came, and told my sister that she could not legally establish her marriage with Mr. Clark, and pretended to read to her a letter in English (a language then unknown to my sister) from Mr. Clark to Mr. Coxe, stating that he was about to marry Miss ——. In consequence of this information, my sister Zuline came to the resolution of having no further communication or intercourse with Mr. Clark, and soon afterwards married Mr. Gardette of Philadelphia.

### Answer to the third interrogatory.

I became acquainted with Mr. Jerome de Grange in 1793, when, as I understood, he first came to New Orleans. He was a nobleman by birth, and passed for a single or unmarried man; and courted and married Zuline, née De Carriere, at the age of thirteen, the same who is the mother of Myra Clark Whitney. Zuline had two children by him, a boy and a girl; the boy died; the girl is still living, her name is Caroline; she is married to a physician by the name of Barnes. I was present at the birth of these children.

### Answer to the fourth interrogatory.

I am not aware of knowing other important matter to the complainants in this cause.

### Answer to the first cross-interrogatory.

My name is Sophie Veuve Despau, née De Carriere. My deceased husband was a planter. I was born in Louisiana. My

---

* The name is omitted by the Reporter.

age is sixty-two. I now reside in Beloxi; from 1800 to 1814, I resided in Louisiana, in Philadelphia, and in Cuba.

#### Answer to the second cross-interrogatory.

I first knew Daniel Clark in New Orleans; his being the husband of my sister, Zuline de Carriere, placed me on a footing of intimacy with him during the time of their intercourse; that intimacy was afterwards interrupted by their separation.

#### Answer to the third cross-interrogatory.

I had reason to know that Mr. Clark, at different times, lived in different houses in New Orleans. I have before said that he did not give publicity to his marriage with said Zuline. He kept a very handsome establishment for her in New Orleans, and was in the habit of visiting her.

#### Answer to the fourth cross-interrogatory.

I have already stated that Mr. Clark was married to my sister, Zuline de Carriere, that I was present at her marriage (a private one), in Philadelphia. Besides myself, Mr. Dorvier of New Orleans, and an Irish gentleman, a friend of Mr. Clark's, from New York, were present at his marriage. A Catholic priest performed the marriage ceremony. I have already before stated, that Zuline was married to Mr. Jerome de Grange before her marriage with Mr. Clark, and that thereafter she was married to Mr. Gardette of Philadelphia.

#### Answer to the fifth cross-interrogatory.

I have already stated that I knew Myra Clark to be the issue, and the only issue, of the marriage of Zuline de Carriere and Daniel Clark. A few days after the birth of Myra Clark, she was placed by her father under the care of Mrs. Davis, the wife of Colonel S. B. Davis, with whom she lived until her marriage with Mr. Whitney. I have heard that Colonel Davis concealed from the said Myra her true history, and that she bore his name after her father's death. Zuline and Mr. Clark occupied different houses in New Orleans, but he always visited her, as heretofore mentioned, at her own house; their marriage was known only to a few friends; Mr. Clark told me that he had informed Colonel S. B. Davis, Mr. Daniel W. Coxe, and Mr. Richard Relf, of his marriage with my sister Zuline.

#### Answer to the sixth cross-interrogatory.

I always understood and believed, at least for the first years of his marriage, that Mr. Clark was prevented from making it public on account of her unfortunate marriage with Mr. De Grange. His pride was great, and his standing was of the

highest order in society, and that pride might have suggested his opposition to the promulgation of his marriage. He, however, always manifested by his conversations, which I frequently heard, the greatest affection for his daughter Myra.

### Answer to the seventh cross-interrogatory.

I have already stated my knowledge of Myra Clark Whitney from her birth. As I never made any secret of my knowledge of her being the daughter of Daniel Clark, nothing was more likely than she and her late husband should hear of my acquaintance with her parentage, and many circumstances connected with it, as already related. And on this it was, I presume, that I have been called upon to give testimony in this affair. But neither of them, nor any body else, ever dared to ask of me any declarations in the least inconsistent with truth and justice.

### Answer to the eighth cross-interrogatory.

I have already in my former answers stated, particularly the third and fourth, my knowledge of Jerome de Grange, and of his first and second marriages. Before the detection of his bigamy, said Zuline had a son who died, and a daughter called Caroline, which bore his name. Since the death of Mr. Daniel Clark, Mr. Daniel W. Coxe and Mr. Hulings of Philadelphia gave her the name of Caroline Clark, and took her to Mr. Clark's mother, and introduced her as the daughter of her son. She of course believed their story, which induced her, in her will, to leave a portion of her property to Caroline. Caroline was born in 1801. I was present at her birth, as well as that of her brother.

### Answer to the ninth cross-interrogatory.

I never heard Mr. Clark acknowledge his having any natural children, but have only heard him acknowledge one child, and that a lawful one, to wit, said Myra.

### Answer to the tenth cross-interrogatory.

I have already given a full account of the mother of Myra, and of Myra herself, and her being with Mrs. Davis. I have stated all that I know of these matters, as called for by this interrogatory.

### Answer to the eleventh cross-interrogatory.

The information called for by this interrogatory has already been given.

#### Answer to the twelfth cross-interrogatory.

.I have already before stated myself to be the sister of Myra's mother. My feelings towards Myra are those of friendship and all becoming regard. I wish, however, that justice only be done towards her, but in or by the issue of the suit I have nothing to gain or lose.

#### Answer to the thirteenth cross-interrogatory.

I have never seen or heard read the interrogatories or cross-interrogatories referred to, before called upon to answer them. Any conversations that I have had about this affair I have already given an account of.

#### Answer to the fourteenth cross-interrogatory.

My natural language is French; but my nephew is well acquainted with the English language, and when in need of a translator, I apply to him.

.(Signed,)     SOPHIE VE. DESPAU, NÉE DE CARRIERE.

Which answers, being reduced to writing, have been signed and sworn to in my presence, this twenty-eighth day of June, A. D. 1839. In testimony whereof, I have hereunto set my hand and seal, this the day and year above written.

. (Signed,)          · HOLMES P. WENTZELL,

*J. P. H. C.* [L. s.]

One word erased on third page, also one word on fourth page; two words interlined on fourth page; twenty-five words erased on fifth page; one word interlined on sixth page, before signing.

·(Signed,)          . H. P. WENTZELL,

*J. P. H. C.* [L. s.]

W. W. WHITNEY and MYRA C. WHITNEY
             *vs.*
RICHARD RELF, BEVERLY CHEW, and others.

In pursuance of the annexed commission, issued from the United States Circuit Court of the Eastern District of Louisiana, I, the undersigned, justice of the peace in Hancock county, State of Mississippi, have caused to come before me Madame Rose Vve. Caillaret, née De Carriere, who being duly sworn to declare the truth on the questions put to her in this cause, in answer to the interrogatories annexed to said commission, says: —

#### Answer to the first interrogatory.

I was well acquainted with the late Daniel Clark, of New Orleans.

Answer to the second interrogatory.

I was not present at the marriage of Zuline, née De Carriere, who is my sister, with Daniel Clark, but I do know that said Clark made proposals of marriage for my sister, and subsequently said Zuline wrote to me that she and said Clark were married. . Mr. Clark's proposals of marriage were made after it became known that her marriage with Mr. De Grange was void, from the fact of his having then, and at the time of his marrying her, a living wife; these proposals were deferred being accepted till the record proof of De Grange's said previous marriage could be obtained, and said Zuline, with her sister, Madame Despau, sailed for the North of the United States, to obtain the record proof.

Answer to the third interrogatory.

I was acquainted with Mr. De Grange in New Orleans. He was considered an unmarried man on coming to New Orleans, and as such imposed on my sister Zuline to marry him; but it was afterwards proved he had a lawful wife still living. After this imposition of said De Grange, his said lawful wife came to New Orleans, and detected and exposed his bigamy in marrying the said Zuline, when he had a living and lawful wife at and before the time of his marrying Zuline. He was prosecuted, condemned, and cast into prison, and escaped privately from prison. He escaped from Louisiana, as it was reported, by the Spanish governor's connivance. Le Breton d'Orgenois was said to aid De Grange, in getting him off. This happened some time before the Americans took possession of New Orleans. Mr. Clark's marriage with my sister Zuline was after the detection of De Grange's bigamy. The birth of their daughter, Myra Clark, was some years after the marriage.

Answer to the fourth interrogatory.

I am not aware of knowing any thing more of importance in this suit, except the marriage of said Zuline with Mr. Gardette, of Philadelphia, before the death of Mr. Clark.

Answer to the first cross-interrogatory.

My name is Rose Veuve Caillaret, née De Carriere. My age is sixty-eight years. I was born in Louisiana, and resided some time in France after this marriage of Zuline and Mr. Clark, and after that resided in the State of Mississippi.

Answer to the second cross-interrogatory:

I became acquainted with Mr. Clark in New Orleans. In consequence of his attachment and marriage to my sister Zu-

line, an intimacy subsisted between him and myself. Our friendly intercourse continued during my residence in New Orleans.

### Answer to the third cross-interrogatory.

When I resided in New Orleans, Mr. Clark lived in his own houses, with his own slaves to wait upon him. He had the reputation of being a man of immense wealth. He stood at the head of society, was considered a man of very great talents, and much beloved for his benevolence.

### Answer to the fourth cross-interrogatory.

I have already stated all I knew about Mr. Clark's marriage with Zuline, and of her marriage with De Grange. By this marriage she had two children, a boy and a girl. The boy is dead, the girl is still living; her name is Caroline, and she is married to Dr. Barnes. I have already stated that said Zuline also married Mr. Gardette.

### Answer to the fifth cross-interrogatory.

It is to my knowledge, that Myra Clark, who married Mr. Whitney, is the child, and only child, of 'Mr. Clark by Zuline de Carriere. It is to my knowledge, that Mr. Clark put his daughter Myra under the charge of Mrs. Davis. Mr. Clark acknowledged to me that Myra was his lawful and only child. Mrs. William Harper nursed her for some time from kindness. Mr. Clark's gratitude towards this lady, for nursing his child, lasted with his life. Said Myra was brought up and educated in the family of Colonel Davis, and supposed herself their child until within a few months of her marriage with Mr. Whitney.

### Answer to the sixth cross-interrogatory.

I always heard that Mr. Clark's marriage with Zuline was private, and that he did not promulgate it, unless he did so in his last will, made a little before his death, and lost or purloined after his death. He never explained to me his reasons for not publishing his marriage in his lifetime.

### Answer to the seventh cross-interrogatory.

I have known Myra Clark Whitney for some years, making no secret about my knowledge I possessed of the matters of which I have herein spoken, and it being known that I was an elder sister of Zuline de Carriere. Therefore it was, I suppose, that I have been called on to testify in this cause; but no one has ever taken the liberty to intimate a wish for me to declare any thing but the truth.

Answer to the eighth cross-interrogatory.

I have already said all.I know about Mr. De Grange.

Answer to the ninth cross-interrogatory.

I never heard Mr. Clark make any acknowledgment of his having any natural children; and I never heard of his having another child than Myra Clark Whitney, and which Mr. Clark informed me was his lawful child.

Answer to the tenth cross-interrogatory.

I have already stated all I know as to the parentage and nursing and education of Myra Clark.

Answer to the eleventh cross-interrogatory.

I have already stated all I know about the parentage and name of Myra Clark, except that I have heard that after her father's death she was called Myra Davis.

Answer to the twelfth cross-interrogatory.

My feelings are friendly and kind towards Myra Clark Whitney, and I wish her such success only in her suit as is compatible with justice. I have no interest in the issue of it.

Answer to the thirteenth cross-interrogatory.

I have never seen the interrogatories put to me until called upon to answer them. I have already stated all I have to say about my conversations. I am not aware of ever having any correspondence with either of them on this subject.

Answer to the fourteenth cross-interrogatory.

French is my mother tongue, but.my son is .well acquainted with the English language, and when in need of a translator, I apply to him.

(Signed,)      VEUVE CAILLARET, NEE ROSE CARRIERE.

As the opinion of the court refers also to the evidence of Bois Fontaine, it is deemed proper to insert it.

*Interrogatories and Answers of Pierre Baron Bois Fontaine.*

WM. WALLACE WHITNEY and MYRA C., his wife, ⎱ Court of
        *vs.*                                           ⎰ Probates.
        P. O'BEARN and others.

*Interrogatories to be propounded to Witnesses on Behalf of the Plaintiffs.*

1st. Were you acquainted with the late Daniel Clark, deceased, of New Orleans? If so, were you at any time on terms of intimacy with him?

2d. Did the said Daniel Clark leave at his death any child acknowledged by him as his own? If so, state the name of such child, whether such child is still living, and if living, what name it now bears; as also state when and where, and in what times, said acknowledgment of said child was made.

3d. Have you any knowledge of a will, said to have been executed by said Clark shortly before his decease? Did you ever read or see the said will, or did Daniel Clark ever tell you that he was making said will, or had made said will? If so, at what time and place, and if more than once, state how often, and when and where.

4th. If you answer the last question affirmatively, state whether the said Daniel Clark ever declared to you, or to any one in your presence, the contents of said will. And if so, state the whole of said declarations, and the time, place, and manner in which they were made, before whom, and all the circumstances which occurred when such declaration was made.

5th. State how long before his death you saw the said Daniel Clark, for the last time, how long before his death he spoke of his last will, and what he said in relation to his aforesaid child.

6th. State whether you ever heard any one say he had read the said will. If so, state whom, what was said, and whether the said person is now living, or not.

(Signed,)                      WM. M. WORTHINGTON,
                                    *For Plaintiff.*

Cross-examined:

1st. Each witness examined, and answering any one of the foregoing interrogatories, is desired to state his name, age, residence, and employment; and whether he is in any manner connected with, or related to, any of the parties to the suit, or has any interest in the event of the same.

2d. How long did you know Daniel Clark, and under what circumstances? And if you presume to state that Daniel Clark left any child at his decease, state who was the mother of said child, and who was the husband of that mother. State all the circumstances, fully and in detail, and whether said Clark was ever married, and if so, to whom, when, and where.

3d. If said Clark ever acknowledged to you, that he supposed himself to be the father of a child, state when and where he made such an acknowledgment, and all the circumstances of the recognition of such a child or children, and whether the act was public or private.

4th. Did said Clark consider you as an intimate friend, to

whom he might confide communications so confidential as those relating to his will? If ay, state what you know, of your own personal knowledge, of the contents of said will, and be careful to distinguish between what you state of your own knowledge, and what from hearsay.

The defendants propound the foregoing interrogatories, with a full reservation of all legal exceptions to the interrogatories in chief, the same not being pertinent to the issue, and the last of said interrogatories being calculated merely to draw from the witness hearsay declarations.

(Signed,)                  L. C. DUNCAN,
                                    For Defendants.

In pursuance of the annexed commission, directed to me, the undersigned, justice of the peace, personally appeared Pierre Baron Bois Fontaine, who being duly sworn to declare the truth on the questions put to him in this cause, in answer to the foregoing interrogatories, says:—

1st. In reply to the first interrogatory he answers,— I was acquainted with the late Daniel Clark of New Orleans, and was many years intimate with him.

2d. In reply to the second interrogatory he answers, — Mr. Clark left at his death a daughter named Myra, whom he acknowledged as his own, before and after her birth, and as long as he lived. In my presence he spoke of the necessary preparation for her birth, in my presence asked my brother's wife to be present at her birth, and in my presence he proposed to my sister and brother-in-law, Mr. S. B. Davis, that they should take the care of her after her birth. After her birth he acknowledged her to me as his own, constantly, and at various places. He was very fond of her, and seemed to take pleasure in talking to me about her.

When he communicated to me that he was making his last will, he told me he should acknowledge her in it as his legitimate daughter. The day before he died, he spoke of her with great affection, and as being left his estate in his last will. The day he died, he spoke of her with the interest of a dying parent, as heir of his estate in his last will. She is still living, and is now the wife of William Wallace Whitney.

3d. In reply to the third interrogatory he answers, — About fifteen days before Mr. Clark's death I was present at his house, when he handed to Chevalier de la Croix a sealed packet, and told him that his last will was finished, and was in that sealed packet. About ten days before this, he had told me that it was done. Previous to this, commencing about four months before his death, he had often told me that he was making his last

48*

will. . He said this in conversation with me on the plantation, and at his house; and I heard him mention this subject at Judge Pitot's. I frequently dined at Judge Pitot's with Mr. Clark on Sundays. The day before he died, he told me that his last will was below, in his office-room, in his little black case. The day he died, he mentioned his last will to me.

4th. In reply to the fourth interrogatory, he answers, — I was present at Mr. Clark's house about fifteen days before his death, when he took from a small black case a sealed packet, handed it to Chevalier de la Croix, and said, "My last will is finished; it is in this sealed packet, with valuable papers; as you consented, I have made you in it tutor to my daughter. If any misfortune happens to me, will you do for her all you promised me? Will you take her at once from Mr. Davis? I have given her all my estate in my will, an annuity to my mother, and some legacies to friends. You, Pitot and Belle Chasse, are the executors." About ten days before this, Mr. Clark, talking of Myra, said that his will was done.

Previous to this he often told me, commencing about four months before his death, that he was making his last will. In these conversations he told me that in his will he should acknowledge his daughter Myra as his legitimate daughter, and give her all his property. He told me that Chevalier de la Croix had consented to be her tutor in his will, and had promised, if he died before doing it, to go at once to the North, and take her from Mr. Davis. That she was to be educated in Europe. He told me that Chevalier de la Croix, Judge Pitot, and Colonel Belle Chasse were to be executors in his will. Two or three days before his death, I came to see Mr. Clark on plantation business; he told me he felt quite ill. I asked him if I should remain with him. He answered that he wished me to. I went to the plantation to set things in order, that I might stay with Mr. Clark, and returned the same day to Mr. Clark, and stayed with him constantly till he died. The day before he died, Mr. Clark, speaking of his daughter Myra, told me that his last will was in his office-room below, in the little black case; that he could die contented, as he had insured his estate to her in the will. He mentioned his pleasure that he had made his mother comfortable by an annuity in it, and remembered some friends by legacies.

He told me how well satisfied he was that Chevalier de la Croix, Judge Pitot, and Belle Chasse were executors in it, and Chevalier de la Croix Myra's tutor. About two hours before his death, Mr. Clark showed strong feelings for said Myra, and told me that he wished his will to be taken to Chevalier de la Croix, as he was her tutor, as well as one of the executors

in it; and just afterwards Mr. Clark told Lubin, his confidential servant, to be sure, as soon as he died, to carry his little black case to Chevalier de la Croix.

After this, and a very short time before Mr. Clark died, I saw Mr. Relf take a bundle of keys from Mr. Clark's *armoire*, one of which, I believe, opened the little black case. I had seen Mr. Clark open it very often.

After taking these keys from the *armoire*, Mr. Relf went below. When I went below, I did not see Mr. Relf, and the office-room door was shut. Lubin told me that when Mr. Relf went down with the keys from the *armoire*, he followed, saw him there on getting down go into the office-room, and that Mr. Relf on going into the office-room locked the office-room door. Almost Mr. Clark's last words were, that his last will must be taken care of on said Myra's account.

5th. In reply to the fifth interrogatory, he answers, — I was with Mr. Clark when he died; I was by him constantly for the last two days of his life. About two hours before he died, he spoke of his last will and his daughter Myra in connection, and almost his last words were about her, and that this will must be taken care of on her account.

6th. In reply to the sixth interrogatory, he answers, — When, after Mr. Clark's death, the disappearance of his last will was the subject of conversation, I related what Mr. Clark told me about his last will in his last sickness. Judge Pitot and John Lynd told me that they read it not many days before Mr. Clark's last sickness; that its contents corresponded with what Mr. Clark had told me about it; that when they read it, it was finished, was dated, and signed by Mr. Clark; was an olographic will; was in Mr. Clark's handwriting; that in it he acknowledged the said Myra as his legitimate daughter, and bequeathed all his estate to her, gave an annuity to his mother, and legacies to some friends. The Chevalier de la Croix was tutor of said Myra, his daughter; Chevalier de la Croix, Colonel Belle Chasse, Judge Pitot, were executors; Judge Pitot and John Lynd are dead. The wife of William Harper told me she read it; Colonel Belle Chasse told me that Mr. Clark showed it to him not many days before his last sickness; that it was then finished. Colonel Belle Chasse and the lady, who was Madame Harper, are living.

In reply to the first cross-interrogatory, he answers, — My name is Pierre Baron Bois Fontaine, my age about fifty-eight; I have been some time in Madisonville; the place of my family abode is near New Orleans, opposite side of the river. I was eight years in the British army. I was several years agent for Mr. Clark's plantations; since his death, I have been en-

gaged in various objects. I now possess a house and lots, and derive my revenue from my slaves, cows, &c. I am in no manner connected with, or related to, any of the parties of this suit; I have no interest in this suit.

In reply to the second cross-interrogatory, he answers, — I knew Daniel Clark between nine and ten years; I knew him as the father of Myra Clark; she was born in my house, and was put by Mr. Clark, when a few days old, with my sister and brother-in-law, Samuel B. Davis. I was Mr. Clark's agent for his various plantations, — first, the Sligo and the Desert, then the Houmas, the Havana Point, and when he died, of the one he purchased of Stephen Henderson. He respected our misfortunes, knowing that our family was rich and of the highest standing in St. Domingo before the Revolution. The mother of Myra Clark was a lady of the Carriere family. Not being present at any marriage, I can only declare it as my belief, Mr. Clark was her husband. To answer this question in detail, as is demanded, it is necessary that I state what was communicated to me. It was represented to me that this lady married Mr. De Grange in good faith, but it was found out some time afterwards that he already had a living wife, when the lady née Carriere separated from him. Mr. Clark some time after this married her at the North. When the time arrived for it to be made public, interested persons had produced a false state of things between them, and this lady being in Philadelphia, and Mr. Clark not there, was persuaded by a lawyer employed, that her marriage with Mr. Clark was invalid, which believing, she married Monsieur Gardette. Some time afterwards, Mr. Clark lamented to me that this barrier to making his marriage public had been created. He spoke to me of his daughter Myra Clark from the first as legitimate, and when he made known to me he was making his last will, he said to me that he should declare her in it as his legitimate daughter. From the above I believe there was a marriage.

In reply to the third cross-interrogatory, he answers, — Mr. Clark made no question on this subject before and after her birth, and as long as he lived he exercised the authority of a parent over her destiny. He was a very fond parent; he sustained the house of Mr. Davis and Mr. Harper, because my sister had her in care, and Mrs. Harper suckled her. He sustained Harper as long as he lived, and conferred great benefits on my brother-in-law. He spoke of her mother with great respect, and frequently told me after her marriage with Mr. Gardette, that he would have made his marriage with her public, if that barrier had not been made, and frequently lamented

to me that this barrier had been made, but that she was blameless.   He said he would never give Myra a step-mother.   When, in 1813, he communicated to me that he was making his last will for her, he, showed great sensibility as to her being declared legitimate in it.   While I was with him at his death-sickness, and even at the moment he expired, he was in perfect possession of his senses, and no parent could have manifested greater affection than he did for her in that period.   Nearly his last words were about her, and that his will must be taken care of on her account.   She, the said Myra, is the only child Mr. Clark ever acknowledged to me to be his.   She was born in July, 1805.

In reply to the fourth cross-interrogatory, he answers, — I was a friend of that confidential character from the time of said Myra's birth.   Mr. Clark treated me as a confidential friend in matters relating to her and to his affairs generally. In reply to the fourth interrogatory, I have stated what I know concerning Mr. Clark's last will ; my recollection of these facts is distinct.   The circumstances connected with them were of such a character, that my recollection of them could not be easily impaired.

  (Signed,)     PIERRE BARON BOIS FONTAINE.


And on the 25th day of April, A. D. 1840, the following decree was entered of record in the words and figures following, to wit : —


EDMUND P. GAINES and wife
     *v.*      } No. 122.
  CHEW & RELF et als.

This cause having come for final hearing, by consent of the complainants and the defendant Patterson, upon the bill, answer, replication, exhibits, depositions, and documents on file herein, and on the admission of the parties, that the estate in controversy in this case exceeds in value the sum of two thousand dollars, and the said complainants and the defendant Patterson expressly waiving and dispensing with the necessity of any other parties to the hearing or decision of this cause than themselves, and agreeing that the cause shall be determined alone upon its merits, and the court, being now sufficiently advised of and concerning the premises, does finally decree and order that the defendant Patterson do, on or before the first day of the next term of this court, convey and surrender possession to the complainant, Myra Clark Gaines, of all those lots or parcels of land lying and being in the city of New Orleans, and particularly described in this answer and

exhibits, and to which he claims title under the said will of (1811) eighteen hundred and eleven; said conveyance shall contain stipulations of warranty against himself only, and those claiming under him. It is further decreed and ordered, that the defendant pay the complainants so much of their costs expended herein as has been incurred by reason of his being made a defendant in this cause.

From which decree the defendant prayed an appeal to the Supreme Court of the United States, which is granted.

And by consent of the complainants, bond and security is dispensed with. By consent, the copy of records of the Probate Court, with a full and complete transcript of the proceedings had in relation to the estate of the late Daniel Clark on file in said court, (hereafter to be filed,) to constitute a part of the record herein.

Decree rendered April 25th, 1840.

Decree signed April 25th, 1840.

(Signed,)            J. McKinley, *Presiding Judge.*

The cause having come up to this court by this appeal, was argued by *Mr. Brent* and *Mr. May,* for the appellant, Patterson, and by *Mr. Johnson* and *Mr. Jones,* for Gaines and wife.

The counsel for the appellant contended that the decree of the court below was erroneous, for the following reasons, viz. : —

1. Because the bill shows no case for equitable relief.

2. Because there is no sufficient evidence of the alleged title in the complainant, as devisee of Daniel Clark.

3. That she is not the heir at law of Daniel Clark.

4. That she was the adulterine child of said Clark, by illicit commerce between said Clark and the mother of complainant, then the lawful wife of Jerome de Grange, and as such child incapable by law of inheriting or receiving by gift or will the property of said Clark.

5. That if not the adulterine child, she was Clark's illegitimate offspring, incapable of receiving from him more than one third of his estate.

6. That the appellant is a purchaser of a legal title to the property in suit, under a will legally admitted to probate, and under the authority of the executors therein named.

7. That the decree is otherwise erroneous and wrongful.

8. That she is not the child of Clark.

The argument of *Mr. Brent* and *Mr. May* was as follows.

The bill of complaint was filed in the Circuit Court of the United States for the District of Louisiana, against the appel-

lant and numerous other defendants. The answers (original and supplemental) of Patterson disclose the nature of his title as *bonâ fide* purchaser under the will of Daniel Clark dated in 1811, and duly admitted to probate in the proper court.

Various depositions and documentary evidence were filed by the complainants and the appellant, and the case being set for hearing as between themselves, a final decree was rendered against Patterson for all the property held by him as purchaser under the will of 1811.

We allege error in that decree.

1st Question. Is the appeal of Patterson properly and fairly before this court? True, there was no order of severance to justify the separate decree against one co-defendant, but we contend, that, under the circumstances of this case, it was competent for the appellant and appellees to set the case for final decree upon all the evidence taken, and the result of such action cannot be to prejudice the other parties in any respect; for if they can materially change the aspect of the case by additional evidence, the judgment of this court on our case will not conclude them. We refer in support of this position to the following authorities. 2 Dana, 422; 2 Bibb, 167; Pract. Reg. 16; 1 Peters, 306; 3 Munford, 368, 374, 397; 6 Harr. & Johns. 10; 3 Dallas, 401.

The course pursued by Mr. Patterson in separating himself from his co-defendants is not the result of collusion with the appellees. If it were, it would be impotent. But it is the fruit of an anxious desire on his part to meet the claims of this claimant fully and fairly on the merits, without delay or resort to any of those dilatory proceedings which have thrice been overruled in this court.

Mr. Patterson wishes to know as speedily as possible whether he is the owner of this property; and he has introduced, as he believes, matter enough in this record to destroy this claim, — at least he has introduced all the evidence known to him.

We are thus attentive to such an imputation of collusion, because, at the argument of a motion to dismiss this appeal made some years ago by the counsel of Caroline Barnes, one of the present counsel understood such an imputation to be made or insinuated in this court by the counsel of Caroline Barnes.

We will, in repudiating this charge, as we do indignantly, by the authority of Mr. Patterson, add to the denial, in his behalf, our own declaration, as officers of this high court, that our instructions have been to defeat the claim of Mrs. Gaines, if possible, by every fair and honorable argument; and in behalf of Mr. McHenry, of New Orleans, we state that a correspond-

ence between him and the gentleman who was understood to make the charge has resulted in acquitting him, as counsel of Mr. Patterson, from every imputation.

2d Question.  Has Mrs. Gaines any title to the property in dispute, as alleged devisee under the will of 1813?

We meet this question by showing from the record that, although there is evidence to prove that Clark had made a will some weeks before his death, declaring Myra his legitimate child and sole heir, yet that will is not proved to have been in existence at his death, save by his dying declarations, which are no evidence whatever of the will being then in existence. Jackson *v.* Betts, 6 Cowen, 382.

These dying declarations were the delirious ravings of a man *in extremis*, oblivious of the fact that he had himself destroyed a will made to practise a pious but posthumous fraud, for the purpose of gratifying an inordinate love for Myra, but a fraud which it is fair to presume, upon this evidence, his sober after-reflections induced him to shrink from, and with his own hands to destroy that will which, if he died without cancelling, would, to his conscience and his God, present him as dying with a falsehood on his lips.

But if the will were existent at his death, it was olographic, and there are not as many competent witnesses to the will as the law required, for the laws then in force exclude women as incompetent.  2 Partidas, 964, Law 9; 1 ib. 23; Laws of Orleans, 230, art. 105.

But this court, in 2 Howard, 646, have settled that this will of 1813 cannot confer title until duly admitted to probate. Therefore, Mrs. Gaines's title, as devisee, cannot be relied on to sustain the decree against Patterson.

3d Question.  Is Mrs. Gaines the child and forced heir of Daniel Clark?

Her bill of complaint alleges her birth in July, 1806, and that up to Clark's death, in 1813, she was called Myra Clark, but after his death, and up to her marriage in 1832, she was called Myra Davis, and was kept in ignorance of her true name and parentage, that is, from 1813 to 1832, a period of nineteen years, and until she was twenty-six years of age, and that in 1832 she learned her rights by accident.

Such is her own showing, and as part of her evidence she brings forward Davis, the very man who had been intrusted by Clark with the sacred deposit of his child.  See Davis's own deposition, Record, 181, 5th, 6th, and 7th answers.  And see Clark's solemn appeal to him in his Philadelphia letter, Record, 183.

Davis says that Clark told him Myra would be his heir. Record, 183, 184.

Now if Davis had not known and ascertained that Myra was an adulterous offspring, incapable by the laws of Louisiana of receiving the munificent but insane bequests of Clark, and that her claims founded on Clark's latter conduct were untenable, how can his treatment of Myra be viewed in any other light than as a shameless abandonment of his solemn trust?

If Davis suppressed the true history of Myra with a conviction that its knowledge would be her triumph, words could not be found adequate to the denunciation of his conduct. But we think the explanation of this conduct is to be found in the fact, that Davis knew this unfortunate offspring of guilty parents to be banned and barred by the policy of the laws of Louisiana, and that to acquaint her with the intentions of Clark towards her would be to lead her into endless and idle litigation. Neither Davis nor his wife attempts to explain their conduct in keeping Myra ignorant of her rights, if they believed she had any. And if her claims are just, the conduct of Davis is directly impeached by the evidence of her own witness, Belle Chasse. General repute called her the child of Davis. See the evidence of Madam Despau, Record, 165; Caillaret, Record, 169; Thiling, Record, 334; Coxe, Record, 337; Bois-Fontaine, Record, 356; Mrs. Smith, Record, 136.

If, as we hereafter propose to establish, the intercourse between Clark and her mother was illicit at all times, then his belief as to his paternity amounts to nothing, especially when it is proved that she does not resemble Clark, as did Caroline Barnes, the elder child. See Coxe's deposition, Record, 336.

Clark's acknowledgments should have been before a notary and two witnesses. Code of 1808, p. 48, art. 24–26.

If alimony alone is sued for, such informal acknowledgments might be sufficient. Code of 1808, p. 50, art. 31; ibid., p. 154, art. 45; ibid., p. 156, art. 45.

If Myra was the illegitimate offspring of Clark, alimony is all she can claim. Code of 1808, p. 156, art. 46; ibid., p. 48, art. 28; ibid., p. 154, art. 45.

But going beyond the character of natural child, Mrs. Gaines claims to be the child of Clark by a lawful marriage of her mother with him. And in considering this claim, we first examine the nature and effect of Clark's declarations, which are said to prove the fact.

Conceding, *ex gratia*, that in 1813, by the pretended will of that year, Clark attempted formally to declare her legitimate, yet how can his genuine and undoubted will of 1811 be reconciled with such latter attempt?

In 1811, Myra was five years old, and living in New Orleans, as Clark well knew, and yet at the time of his undertaking a

sea-voyage he executes that will, wholly pretermitting any notice of Myra, and willing all his estate to his mother.

Why did he overlook Myra? Was he the unprincipled father, who would disinherit his young and innocent offspring? No, he was not unmindful of her claims, and he sought to provide for her in the only secret and stealthy mode permitted by the penal laws of Louisiana.

He executes various deeds to Belle Chasse, De la Croix, and Davis, on blind trust, for Myra's benefit, thus creating no legal right for Myra, but an honorable claim on the consciences of these friends for a handsome property. See their depositions.

Who can believe that an anxious father would thus hazard the whole property designed for his helpless and lawful child, by blind confidence in the honor of human beings, when by will or deed he could guard her rights effectually and beyond contingency?

We defy and challenge any satisfactory explanation of these acts, consistent with the claim of Mrs. Gaines. But if, as we allege, Clark knew her to be the adulterine offspring of Madame de Grange by him, then his conduct can well be understood. For, by the laws of Louisiana, an adulterous offspring can receive from its parent nothing but alimony, either in the shape of donations *inter vivos* or *causa mortis.* Code of 1808, p. 212, art. 17.

This statutory interdict, then, was the cause of Clark's making his will of 1811, and creating blind trusts for the benefit of Myra.

But there are other acts of Clark which go to destroy his later attempt to efface the stain on Myra's birth, such as the secrecy with which her birth was guarded, and the haste with which he tore the tender infant from her mother's breast; his never suffering this child to dwell under his roof; and, last y; his attempt, after his pretended marriage with the mother of Myra, to marry Miss ——. See deposition of Madame Despau.

These acts of Clark, when arrayed against the will of 1813, if it were here in court, subscribed by his hand, would speak the truth with a power and eloquence which no after conduct of his could resist.

The truth is, that the inconsistent will of 1813 arose from the increase of affection for his natural child, who daily fastened on his heart, as proved by her own witnesses, and in the infatuation of his love he madly conceived the purpose of making a will declaring her his lawful child and universal legatee.

This pious fraud was frankly avowed to his bosom friend, the Chevalier de la Croix. See his deposition.

But, doubtless, as he dwelt more upon the moral crime of perpetrating this fraud on society, and on the truth, he tore that will with his own hands, and hence its non-appearance, though, in the delirium of fever, he murmured of it as still existing.

Then we assert that Clark's acts and conduct are the strongest witnesses against the claim of Mrs. Gaines as his heir at law.

Let us see if the mother of Mrs. Gaines has not also testified against this pretended marriage.

If she was Clark's wife, as pretended, she afterwards committed rank bigamy in marrying Gardette, living Clark. See Coxe's evidence, and the marriage certificate.

Nay, she told Coxe, that, so far from being married to Clark, she had only his promise to marry.

Then both Clark and his pretended wife have testified against their intermarriage, and if they so testify, who is the witness to outweigh them? Madame Despau is the solitary witness to the marriage, — a sister of Myra's mother.

Madame Despau impeaches herself by showing her privity with the marriages of her sister to both Clark and Gardette, and her reasons are flimsy for a justification. Record, p. 164. It was rash enough for her to stand by, in the lifetime of Jerome de Grange, the first husband of her sister, and see that sister marry Clark, with nothing to shield her from bigamy but the statement of Gardette, that, to his knowledge, De Grange had a prior living wife.

All this, as stated by her, is bad enough; but her inconsistency about De Grange twice flying, her attempt to palm off Caroline Barnes as the child of De Grange, her statement that the visit of herself and sister in 1803 was to hunt up the records at the North of De Grange's prior marriage, when Coxe proves that their visit was in 1802, and that in that year her sister, in Philadelphia, gave birth to Caroline, at which time De Grange was absent in Europe, — all these things taint and condemn this witness, and her unsupported testimony to this factum of marriage must fall.

No one can doubt, on these facts, that, so far from Madame de Grange and Clark going to Philadelphia to hunt up records and have a marriage, they went there to shroud from the eye of observation the birth of Caroline, the first fruit of an adulterous intercourse between Clark and the mother of Myra.

If Madame Despau be "falsa in uno, falsa est in omnibus." See The Santissima Trinidad, 7 Wheaton, 283. Madame Despau is the universal marriage witness of her sister, who, on her own evidence, had three husbands, all living at

the same time; first, De Grange, then Clark, and then Gardette. She says that while in Philadelphia, on the occasion of a visit, some years after the marriage of Clark, her sister married Mr. Gardette, because she was told, in the presence of Madame Despau, by Coxe and Smythe, a lawyer, that her sister could not prove her marriage to Clark. Record, 164.

Where, we ask, was her own proof? Where Mr. Dorvier, the other witness stated by her to Clark's marriage? But where was her sense of virtue, that would suffer her to stand by and see her sister marry Gardette, living Clark? And this bigamy with Gardette is perpetrated and connived at by two sisters who had warred against the bigamy of De Grange, as the complainant alleges.

If we believe Madame Despau, she and her sister, Madame de Grange, had, in 1808, to abandon all hope of proving a splendid marriage with Clark, which the child of that pretended marriage expects now to prove, after the lapse of thirty-nine years. Madame Despau says that her sister Zuline had two children by De Grange. Record, 164 and 166. Yet another sister, Caillaret, says no child was born of that union. Record, 293. And afterwards Madame Despau, in a subsequent deposition, shifts her evidence on this point and conforms it to Madame Caillaret's statement. But establish the *factum* of an intermarriage between Clark and the mother of Myra, which cannot be, yet that mother was already the lawful wife of Jerome de Grange, who was then and afterwards alive. This prior marriage of Zuline to De Grange is proved by Mrs. Gaines's own witnesses, Madame Despau and Madame Caillaret, in 1796. How then could Madame de Grange contract marriage with Clark in 1803, unless De Grange was dead, which is not pretended? Because it is said De Grange's marriage with Zuline was null, by reason of his having a prior wife alive in 1796. Where is the proof of this allegation?

There are but three attempts to prove this allegation in the record, viz. : — First, the hearsay of Gardette, that he knew De Grange had a prior living wife. This hearsay is no evidence against us, as we have no claims under Gardette.

Secondly, that a report was current in New Orleans that a woman came there claiming to be the wife of De Grange. But where she came from, or where she went, no one knows, and common report is no evidence of such a fact. Mima Queen's case, 7 Cranch, 290.

Thirdly, the confessions of De Grange that his marriage with Zuline was void by reason of his prior marriage.

To this we answer, that these confessions are as much hearsay when brought against us, as Gardette's statements were; for

we do not claim under De Grange, and to let his unsworn statements go in evidence against us would be to make our rights depend upon his *ex parte* statements, without any means or opportunity to us of testing their truth or falsehood. Morgan *v.* Yarborough, 11 Louis. R. 76.

We have spoken of but three attempts to prove De Grange a bigamist, for we will not even call the failure to prove him so by record proof an attempt.

On the face of complainants' bill, it appears that the defendant, Patterson, claims under the will duly probated, and dated 1811. And Patterson, being a third possessor, cannot be ousted until she has discussed, that is impeached, the will of 1811, by proceeding against the legatees therein. Hodder *v.* Shepherd, 1 Louis. R. 507; Code of 1808, p. 214, art. 26; ibid., p. 216, art. 37 – 39. She ought to have sued to discuss that will in four years after her majority, or eight years at farthest. 2 Partidas, 1046; 1 ibid. 384; Constitution of 1812, art. 4, § 11.

By these laws she was barred in July, 1831, or July, 1835, at farthest, which is before the bill was filed, and the benefit of this prescription appears on the face of her bill, and need not be pleaded.

We insist that the title of Patterson was legally derived under the will of 1811, and that the sales were all regular and valid in every respect.

And in conclusion, if there be a doubt on this whole case, it should inure to the benefit of *bonâ fide* purchasers, whose titles ought not to be overturned in a case like this.

For Mrs. Gaines, personally, we feel every sympathy; but how often is it that the innocent offspring is made to suffer for the acts of the parent! And if ever parents deserved condemnation here or elsewhere, these parents have deserved it. A mother who, for the world's false esteem, would discard from her maternal breast two helpless infants, and never again look upon her own offspring, — a mother who, upon the case made by her own daughter, stands convicted of adultery before her pretended marriage with Clark, and with bigamy afterwards, — such a mother is above the judgment of human tribunals. And what shall we say of the conduct of Daniel Clark, if Myra be his lawful child, and Madame de Grange was his lawful wife? Courting another woman while his wife was living, and at his death forgetting that she had been his wife, although he had, as pretended, pronounced her blameless, participating in the crime of separating two infants from their mother to save the paltry pride of that mother, — such a man, if the claims of this lady be just, should be consigned to infamy in all human estimation. Even now,

the web of destiny hangs around this unfortunate but innocent offspring, and the dreadful past cannot be recalled. After the lapse of forty years, the sun of truth shines upon this dark and adulterous intrigue, revealing all its deformity on the highest judicial records, and showing the vanity of Clark's latter attempts to efface the stain, if it could be called a stain, which his own wild passions had placed upon his child at her birth.

The Reporter is compelled to omit the arguments of *Mr. Johnson* and *Mr. Jones*, the counsel for Gaines and wife, as, their insertion would make the report of this case too long.

Mr. Justice WAYNE delivered the opinion of the court.

The history of this case will be found in the report of the case of Gaines v. Relf and Chew, in 12 Howard, 619.

This is the fourth time that the cause has been before this court. Its decision, in each instance hitherto, has been in favor of the complainants.

The third time, it was brought here upon points upon which the judges in the Circuit Court were divided in their opinions. They arose upon the argument of demurrers, filed by several of the defendants.

It was said there was a want of equity in the bill; that there was a complete remedy at law; that the bill was multifarious, and that there was a misjoinder of parties; that the will of 1813, upon which the complainants relied for a recovery, had not been admitted to probate; and that if the complainants relied upon Mrs. Gaines being the forced heir of Daniel Clark, whatever that right might be, it was recoverable at law.

Upon the argument of the demurrers, three points were made upon which the judges could not agree, and they were certified to this court for its decision.

Those points were, —

1st. Was the bill multifarious, and have the complainants a right to sue the defendants jointly in this case?

2d. Whether the court could entertain jurisdiction of the cause, without probate of the will set up by the complainants, which they charge to have been destroyed and suppressed?

3d. Has the court jurisdiction of this cause, or does it belong exclusively to a court of law?

On the first point, this court, for reasons which are as satisfactory to us as they were to the judges who then heard the argument, decided that the bill was not multifarious; that there was no misjoinder, excepting that the purchasers of the property of Daniel Clark had no interest in the rendition of the accounts by the executors, under the will of 1811, nor any with what

might be the interest of Caroline Barnes in the will of 1813; that those particulars ought not to be connected with the general object of the bill, but that it could be so amended, in both respects, in the Circuit Court, as to avoid the exceptions.

Upon the second point, this court, upon a full review of the authorities, came to this conclusion, — that both the general and local law require the will of 1813 to be proved in the Court of Probates before any title can be set up under it ; but that this result did not authorize a negative answer to the second point.

The court said, that, under the circumstances of the case, the complainants were entitled to full and explicit answers from the defendants in regard to the wills of 1813 and 1811, and that such answers, being obtained, might be used as evidence before the Court of Probates to establish the will of 1813; and to revoke that of 1811. The answer was pertinent to the inquiry, and nothing beyond it. We have adverted to it to show that the decree of the Circuit Court now under consideration has no connection with the will of 1813, and that it was made by that court under the answer given by the court to the third point.

The third point was, Has the court jurisdiction of the cause, or does it belong exclusively to a court of law ?

This point involved the jurisdiction of the court in every aspect in which the bill could be viewed. So the court considered it. The claim made in the bill for Mrs. Gaines did not rest alone upon the alleged will of 1813, but also upon the allegation that she was the legitimate child of Daniel Clark, and, under the law of Louisiana, was his forced heir. The court said, " The complainants, in prosecuting their rights upon the ground of Mrs. Gaines being the heir at law, no probate of the will of 1813 will be required. They must rest upon the *heirship of Mrs. Gaines*, the fraud charged upon the executors to the will of 1811, and notice of such fraud by the purchasers. In this form of procedure, the will of 1811 is brought before the court collaterally. It is not an action of nullity, but a proceeding which may enable the court to give proper relief without decreeing the revocation of the will of 1811."

Such were the answers given by this court to the points which had been certified to it.

The Circuit Court, in the subsequent trial of the cause between the complainants and the appellant, Mr. Patterson, has decreed that Mrs. Gaines is the forced heir of Daniel Clark, or in other words, that, being his legitimate child, she was entitled, under the laws of Louisiana, to her *légitime* in his estate at the time of his death.

This decree was made upon the pleadings and proofs in the cause, put in by the complainants and the appellant, Charles Patterson. He was one of the defendants who had not demurred to the bill. Before those demurrers had been filed, Mr. Patterson had filed his answer, by his counsel, but *not under oath*, having availed himself of the waiver in this respect tendered to the defendants by the complainants. To that answer there was a general replication. The parties having introduced their proofs, the case was regularly in order for a hearing. It was heard at the earnest desire of both parties. No suggestion was made in the Circuit Court below, that it would direct an issue to be made for the trial of the legitimacy of Mrs. Gaines by a jury. No such desire has been expressed by the counsel of the appellant in this court, though it was intimated that it ought to have been done. We do not think it an occasion for such a course to be pursued.

The practice of granting issues is limited to cases in which the court, in the fair exercise of its discretion, considers that justice will best be obtained by that course. Discretion, we mean, as it is guided by what has been the practice of courts of chancery. Gardner *v.* Gardner, 22 Wendell, 526 ; Drayton *v.* Logan, Harp. Eq. 67 ; 3 Paige, 457, 601.

In the English chancery, except in the case of an heir at law or of a rector or vicar, it is not a matter of right. In the American courts of equity we know of no practice establishing an issue as a matter of right. In Virginia and others of our States, the heir's right to an issue is given by statute. As the English chancery, in the exceptions mentioned as a matter of right, has allowed them, upon the ground that the common law "invests a party filling a particular situation with certain rights, of which it is the object of the suit to divest him, we presume that where, by operation of the law, in either of the States, particular persons have an interest in the property of an ancestor, whatever might be the evidence in favor of the authenticity and genuineness of the will, if the heirs at law object to its being done, the court will not establish the will, without the opinion of a jury upon a *devisavit vel non.*"

We have recurred to what has been hitherto decided in this cause concerning jurisdiction, to prevent hereafter, in the further progress of it against any of the defendants, any doubt about it ; and that the principles upon which this court has asserted it might be better understood than they seem to have been at the bar. The Circuit Court, in rendering its decree, understood it perfectly. We have been particular, too, in repeating what was decided by this court in 2 Howard, 619, because it comprehends the subject-matter upon which the ju-

risdiction of the court was affirmed, and covered all who were parties, with the exceptions mentioned, and their obligations to answer, either jointly or separately, the bill as they pleased; though the whole of them, or any lesser number, might have a common defence. The object being that a final decree might be made between the complainants and each defendant, provided the interest or property upon which the decree is to attach was a part of the property of Daniel Clark and now separate in each defendant who might answer separately, or in any two or more of them who might do so jointly. Or if the defendants, as they had a right to do, — except such of them as have already chosen not to answer conjointly, and have answered separately, — should make a common answer, that the decree between the parties might be common to all, and attach upon the property of Daniel Clark in their hands, if the complainants make out the right of Mrs. Gaines, as forced heir of Daniel Clark. This disposes of the question of jurisdiction, and of the suggestion made in the course of the argument of the cause here, though not strongly insisted upon, that the jurisdiction or practice of the court did not permit a separate decree against Mr. Patterson, or any other defendant in the cause. If the decree against any of the defendants determines the character of the subject-matter or property for which he is sued, making it a part of what shall be the aggregate from which the complainants' interest is to be calculated, it is a final decree, and perfect against the defendant, though it may require the confirmation of a further order of the court before it can be acted upon; as in cases of foreclosure, or where a fund may be distributable among a particular class of individuals, or where, in the distribution of an estate, it becomes necessary to direct a master to report upon its kind or value, &c., &c., of which there is a full illustration in the decree given by this court in the case of Michoud *v.* Girod, 3 Howard, 543.

The cause is now before this court upon the appeal of Mr. Patterson.

The argument of the learned counsel, Messrs. Brent and May, in favor of the reversal of the decree may be condensed as follows: —

1. There is no circumstantial evidence in favor of the marriage between the mother of Mrs. Gaines and Daniel Clark.

2. The testimony of Madame Despau, who declares that she was present at the marriage, is not entitled to belief on many accounts.

3. Mr. Clark's acknowledgments that Myra, Mrs. Gaines, was his legitimate child, even if admissible, are contradictory, if De la Croix has spoken the truth, as he spoke differently

of her to that witness.  And they are intrinsically overruled
by his most solemn acts, in stealthily providing for her by
blind trusts, and more especially by the will of 1811.

4. Conceding, *exempli gratia*, that there was a *factum* of
the alleged marriage, still there is proof of the marriage of
the mother of Mrs. Gaines with De Grange, and no legal or
satisfactory proof of the nullity of that marriage; because
De Grange's confessions that he had a wife alive at the time
he married the mother of Mrs. Gaines are not evidence, — par-
ticularly not so in this case, as the appellant does not claim
the property for which he is sued under De Grange.  The ar-
gument of counsel upon the point of a previous and subsist-
ing marriage was this: — There is direct proof of a marriage
between Zuline Carriere, the mother of Mrs. Gaines, and De
Grange.  To annul it, there is no other testimony than the
hearsay of De Grange's confessions, and Gardette's declara-
tions, that, when De Grange married Zuline, he was then a
married man, — that it was a common rumor in New Orleans,
that such was the fact, — that a woman calling herself Mrs.
De Grange, and claiming to be the wife of De Grange, came
to New Orleans in pursuit of him, as her husband.  It is said,
if she did, her assertions were equally hearsay.  Reputation in
New Orleans that the marriage with Zuline was null would
be no evidence of the fact.  Further, it is said the attempt to
prove De Grange's conviction for bigamy is a failure.  But
even if the record of his conviction had been produced, which
was not done, it is *res inter alios acta*, and could not be
admitted against the appellant, who does not claim under De
Grange, but under conveyances from the executors to the will
of 1811.

The counsel also contend, whether they are right or wrong
in the foregoing positions is a matter of no consequence, ex-
cept as showing the history of the case, and tending to pre-
vent further litigation, because, by the code of Louisiana of
1808, reënacted in this particular in the code of 1825, it is de-
clared that a person holding property by sale from a donee of
an excessive donation is only liable to the forced heir, after
an execution first had against the property of the donee.
Under both codes, too, the third possessors are only liable in the
order of their purchases.  That the *légitime* of the forced heir
is not to be recovered in the specific property, but in the value
of the *légitime*, as it may be ascertained under the Louisiana
codes.  For these last positions, counsel rely upon the lan-
guage of the codes, and upon the case of Hodder *v.* Shep-
herd et al., 1 Louis. R. 505.  That was a case which arose
under the code of 1808, but is cited in the new code as a

judicial exposition of both the old and new code, in this respect. It is said that this case is within the provisions of the code under the decision just cited, as Mary Clark, the mother of Daniel Clark and grandmother of Mrs. Gaines, as universal legatee of her son by the will of 1811, accepted the succession of his estate as the law of Louisiana required it to be done. That her power of attorney to the executors, Chew and Relf, authorized them to make sales of the property of Daniel Clark as they were made, and gave to the purchasers valid titles, without any order of the Probate Court, or any judicial sale, being necessary. That the purchasers are not liable to be sued at all, until the forced heir exhausts the property, or, in other words, discusses the rights or property of the grandmother in her son's estate.

The statute of limitations, it was also said, barred a recovery by the complainants.

We have stated more particularly than we would otherwise have done the arguments urged by the counsel of the appellant, and in the strongest way in which they were presented. It was due to the importance of the case, to the interest of all concerned in this controversy, and because the arguments of both of the counsel command our respect. Parts of some of these objections have our acquiescence, others have not.

Our conclusions relating to the marriage of the mother of Mrs. Gaines to her father, the lawfulness of the marriage, and that she is the legitimate offspring of that marriage, differ from all that has been urged against them.

The marriage, the legitimacy of Mrs. Gaines, and the validity of the sales made by the executors, make the substance of this case put in issue by the pleadings. Were those pleadings different from what they are, there would be enough to prove the marriage and the legitimacy of Mrs. Gaines. But as the pleadings are, we cannot, upon the evidence, exclude such conclusions.

The marriage must be proved, according to what would be proof of it where it took place. This marriage took place in Pennsylvania, at Philadelphia, in the presence of a witness who says she was present, and that the ceremony was performed by a Catholic priest. "Marriage is a civil contract in Pennsylvania, to be completed by any words in the present tense, without regard to form." Hantz v. Sealy, 6 Binney, 405. "Marriage is to be decided by the laws of the place where celebrated." Phillips v. Gregg, 10 Watts, 168. Every intendment is to be made in favor of legitimacy. Senser v. Bower, 1 Penn. R. 453.

The bill asserts the marriage, its lawfulness, and that Mrs.

Gaines is the issue of the marriage; the answer is a denial of these allegations. .The plaintiffs· file a general replication.· But as the appellant accepted the waiver offered in ̀the bill, that their answers might be put in without being sworn to, and did not swear to his answer, he is not entitled to have the benefit of his answer as a denial of ̀the plaintiff's case, unless the denial is contradicted by the evidence of two witnesses, or by one and corroborating circumstances. ·

· In the case of the Union Bank *v.* Geary, 5 Peters, 99, this court said; — "Indeed, we are inclined to adopt it ds a general · rule, that an answer· not under oath is to be considered merely as a .denial of the allegations of the bill, analogous to the general issue at law, so as to put the complainant to the proof of such allegations." In Bartlett *v.* Gale, 4 Paige, Ch. R. 503, the Chancellor says, — "But where an answer on oath is waived, although, as a pleading, the complainant may avail himself of · admissions and allegations in the answer which go to establish the case made by the bill, such answer is not evidence in favor of the defendant for any purpose." An answer is always under oath, unless the plaintiff chooses to dispense with· it, and then the court will order the answer of the .defendant to be taken without oath. But whether the answer is not sworn to by the order of the court when the plaintiff waives it, or the waiver · has been voluntarily accepted by the defendant, it is not evidence in his favor for any purpose. As this court said in 5 Peters, just cited, it is analogous to the general issue at law, and a single undiscredited witness will be sufficient to prove the allegations in the bill which the answer denies. There is such a witness in this case. We do not intend, however, to put the conclusion to which we have come respecting the marriage solely upon her testimony. It is so strongly corroborated by other proofs, that the answer would be disproved if· it had been sworn to.

Madame Despau says, — "Daniel Clark was married in Philadelphia, in 1803, by a Catholic priest. I was present at the marriage. One child was born of this marriage, to wit, Myra Clark (now Mrs. Gaines), who married William Wallace Whitney, son of General T. Whitney of the State of New York. I was present at her birth, and knew that Mr. Clark claimed and acknowledged her to be his child. ·She was born in 1806. I neither knew, nor had any reason to believe, any other child besides Myra was born of that marriage." The witness then proceeds to relate what she terms the circumstances of the marriage, including the previous marriage of Zuline Carriere with De Grange, his subsisting marriage when he married Zuline, and the result of it, when that fact had been discovered

by Zuline and her family. This witness is not discredited in any of the ways or for any of the causes which can allowably be used for such a purpose. She is not contradicted by any witness.

Marriage may be proved by any person who was present, and can identify the parties. St. Devereux v. M. Dew Church, Butr, S. C. 506; 2 W. Black. 145.

If the marriage were in a foreign country, proof that it was solemnized in the manner usual in that country will be good presumptive proof that it was a valid marriage. Lacon v. Higgins, 3 Stark. 178.

Marriage by a person habited as a priest and being *per verba de presenti*, the person performing the ceremony must be presumed to have been a clergyman. Rex v. Brampton, 10 East, 282.

In what way is the attempt made to lessen the force of her testimony? In no other than by negative declarations of other persons who knew Clark, that they do not believe he was ever married; and by the witness De la Croix, who says, — and he is the only witness who says so, — that Clark spoke to him of Myra as his natural child. A hundred such witnesses would not be sufficient to impeach the testimony of one witness swearing positively to the fact of the marriage. And allowing that Clark did so speak to De la Croix, a husband's declarations of the illegitimacy of a child when the marriage has been so proved is not sufficient to rebut the presumption of its having been lawfully begotten, until the presumption is disproved by evidence showing the want of access between the husband and wife. Bury v Phillpot, 2 M. & K. 349.

Once the marriage is proved, nothing shall be allowed to impugn the legitimacy of the issue short of the proof of facts showing it to be impossible that the husband could be the father. See opinion of the judges in Banbury Peerage case by Le Marchant. Access is presumed, unless the contrary be plainly proved.

But all the other witnesses, some of whom were more in Clark's confidence than De la Croix was, say that he spoke to them of Myra as his legitimate child, calling her such.

Pierre Baron Bois Fontaine declares, that Clark treated him as a confidential friend in matters relating to Myra and to his affairs generally; that he was with Clark when he died. He says Clark repeatedly spoke to him of Myra as his legitimate child. Nearly his last words were about her. And further he spoke of her mother with great respect, and frequently told him, after her marriage with Gardette, that he would have made his

marriage with her public if that barrier had not been made; but that she was blameless.

Mrs. Harriet Smith says, — "Mr. Clark and my late husband, Mr. Harper, were intimate friends, &c. I suckled in her infancy Mr. Clark's daughter Myra. I did it voluntarily, in consequence of her having suffered from the hired nurses. Mr. Clark considered that this constituted a powerful claim on his gratitude and friendship, and he afterwards gave me his confidence respecting her." The interesting and truthful narrative of this witness of the relations between the father and the child, from her birth to the time of his death, and his frequent declarations that he would acknowledge her as his legitimate child, must make strong impressions upon any reader of it that she was such. Belle Chasse, the intimate and confidential friend of Clark for many years, and who proved himself, as the facts in the case show, worthy of that relation, says, — "With much reflection and deliberation, Clark spoke of his being occupied in preparing his last will. On these occasions, in the most impressive and emphatic manner, he spoke of Myra as the object of his last will, and that he should in it declare her to be his *legitimate child* and heiress of all his estate."

Madame Caillaret, the sister of Zuline, says she was not present at the marriage of her sister with Mr. Clark, "but I do know that Clark made proposals of marriage with my sister. Mr. Clark's proposals of marriage were made after it became known that her marriage with Mr. De Grange was void, from the fact of his having then, and at the time of his marrying her, a living wife. These proposals were deferred being accepted until the record proof of De Grange's previous marriage could be obtained, and Zuline, with her sister, Madame Despau, sailed for the *North of the United States*, to obtain the record proof." Thus confirming what Madame Despau likewise says of Clark's proposals of marriage : — "Mr. Clark made proposals of marriage to my sister, with the knowledge of all our family. It was considered essential first to obtain record proof of De Grange having a living wife at the time he married my sister, to obtain which from the records of the Catholic church in New York, (where Mr. De Grange's prior marriage was celebrated,) we sailed for that city. Mr. Clark arrived after us. We heard that a Mr. Gardette, then living in Philadelphia, was one of the witnesses of Mr. De Grange's prior marriage. We proceeded to that city, and found Mr. Gardette. He answered, that he had been present at the prior marriage of De Grange, and that he afterwards knew De Grange and his wife by this marriage, — that this wife had sailed for France. Mr. Clark then said, 'You have no reason any longer to refuse being

married to me. It will, however, be necessary to keep our marriage secret till I have obtained judicial proof of the nullity of your and De Grange's marriage.' Clark and Zuline were then married." Madame Despau then relates their return to New Orleans, the prosecution of De Grange for bigamy, his imprisonment, escape, and flight from the country, without his having ever returned to Louisiana again. "All this happened in 1803, not a great while before the close of the Spanish government in Louisiana. Mr. Clark told us that, before he could promulgate his marriage with my sister, it would be necessary for her to bring an action against the name of De Grange. The anticipated change of government caused delay; but at length, in 1806, Messrs. James Brown and Eligeas Fromentin, as the counsel of my sister, brought suit against the name of Jerome de Grange, in the City Court of New Orleans."

Now, rejecting all that Gardette is said to have said, all that Madame Despau says of the prosecution of De Grange for bigamy, and of the appearance of a female in New Orleans claiming De Grange for her husband, as not being within the allowable limits of hearsay testimony in a question of pedigree, the concurring testimony of two witnesses in the family as to Mr. Clark's proposals of marriage is such a corroboration of the declaration of one of them, that the marriage took place in her presence, as to make a basis broad enough to receive the declarations of the father, and his affectionate treatment of his child from her birth to his death, as conclusive of his marriage with her mother, and of her legitimacy. Such declarations, where there are probable grounds of a marriage, are the best proof in a question of pedigree. Just such — though they are within what is termed hearsay — as experience has shown to be necessary, in cases of doubt, to establish conjugal relations and the legitimacy of children. Such declarations, unlike those which De la Croix says Mr. Clark made to him, have always been received to establish the legitimacy of a child, with or without proof of marriage; and when there is in a case the positive testimony of one witness to a marriage, they are conclusive proof of legitimacy.

What is urged against such a conclusion in this case?

The conduct of the parties in not promulgating their marriage, and not occupying the same house upon their return to New Orleans. In connection with that conduct, the testimony of De la Croix, that Colonel and Mrs. Davis, who reared Mrs. Gaines at the request of her father, knew nothing of his marriage; that the witnesses, Mr. Coxe and Mr. Hulings, who were for a long time the intimates of Mr. Clark, — the former his partner in business, — swear, to the best of their be-

lief, that he never married. And the subsequent connection with Gardette, without a dissolution of the marriage with Mr. Clark.

The first is a good objection, until it has been reasonably accounted for. We do not mean so accounted for as to make it proper, but enough so to separate such conduct from the suspicion of an illicit connection.

Madame Despau declares, when the marriage was contracted in Philadelphia, and afterwards upon their arrival in New Orleans, that Clark said the marriage could not be disclosed on account of Zuline's previous marriage with De Grange; that legal proof must be obtained of the previous marriage of De Grange, and that an action would have to be brought by Zuline "against his name." This is substantially confirmed by Madame Caillaret, in her statement of the proposals for a marriage by Mr. Clark, and it having been deferred for the reason given by Madame Despau for its concealment. It is confirmed by what other witnesses say, as well as Madame Despau, of the arrest and imprisonment of De Grange for bigamy, to which they all swear as within their own knowledge, and by the subsequent proceedings in the City Court against De Grange. (Record, 206.) Connect the preceding with the mode of proceeding in Louisiana to impeach a marriage with one unable to contract marriage, its existing application to De Grange, and what might then have been its application to Mrs Clark if her marriage in Philadelphia had been disclosed before a sentence of the nullity of her marriage with De Grange had been obtained, and we shall have facts from which motives fo concealment of it may be inferred diverse from and stronger than the usual suspicion of its having been caused by an illicit intercourse. It was not necessary to the validity of the marriage in Philadelphia, that a sentence of dissolution should have been first pronounced in Louisiana against De Grange. By the law of the latter, as well as by the law of Pennsylvania, the marriage with De Grange was void from the beginning. A void marriage imposes no legal restraint upon the party imposed upon from contracting another, though prudence and delicacy do, until the fact is so generally known as not to be a matter of doubt, or until it has been impeached in a judicial proceeding, wherever that may be done. Mr. Clark probably knew what we have just stated concerning the validity of his marriage; but from his pride and temper, as his character has been disclosed in this record, was it not probable, not to say natural, that such a man, anticipating his return to Louisiana, would resort to the course which was pursued, to keep his feelings from being wounded, until a judicial sentence had re-

stored his wife to the unequivocal condition enjoyed by her before the imposition of De Grange? We speak of the fact, and not of its propriety. The latter has not our approbation, but we recognize what all of us know to be true, that concealment is as frequently the refuge of error as it is of crime, and that men of the world shun more than any thing else the exposure of their follies, more especially such as the world may think to be so, and bearing upon the honor of the most delicate relation which a man can form in life. It is not a fiction, that men have been situated as Mr. Clark was, who have died without disclosing, as he did, even in behalf of their unoffending children, such a relation, and that women have been found to bear it. Such reflections would have no weight with us, unconnected with the proof that there is in this case of the marriage. But we think, with such proof, that they are appropriate to repel any presumption of illegitimacy in this instance, arising from the concealment of the marriage, or from the parties to it not having occupied the same house. The events which followed embittered the rest of this father's life, and, until now, have deprived his child of that legitimate standing which he was most anxious to give her, and which seems to have pressed most heavily upon him at the hour of his death. Bois Fontaine says, in reply to the third cross-interrogatory, — "He spoke of her mother with great respect, and frequently told me, after her marriage with Gardette, that he would have made his marriage with her public if that barrier had not been made, and frequently lamented to me that it had been made; but that she was blameless. He said he would never give Myra a step-mother. When, in 1813, he communicated to me that he was making his last will, he showed great sensibility as to her being declared legitimate in it. While I was with him in his death-sickness, and even at the moment he expired, he was in perfect possession of his senses, and no parent could have manifested greater affection than he did for her. Nearly his last words were about her," &c.

Time with him was near its end, and the truth was told.

De la Croix's testimony, in the particular in which it is relied upon, differs from that of all the other witnesses, who have deposed to what Mr. Clark said to them, repeatedly, of the legitimacy of his child.

We regard it the less, for notwithstanding his intimacy with Mr. Clark, and the confidence which he had in De la Croix's suitableness to be the guardian of Myra, he says Mr. Clark never spoke to him about her, except on the occasion when he was asked to become his executor and her tutor. Record, 233, 234. This declaration to De la Croix, supposing it to

have been made in connection with the occasion when he says it was made by Mr. Clark, is the testimony in the record most relied upon to disprove the legitimacy of Mrs. Gaines. But it cannot be allowed to exceed in weight the testimony of several other witnesses who were more intimate with Mr. Clark than De la Croix was, who — from facts in the cause independently of any declarations of theirs — seem to have had more of his confidence, and to whom Mr. Clark spoke very differently of the same fact. A single declaration, directly the reverse of many to the same fact, may be made in such a manner, by the same person, as to disable us from coming to a conclusion coincident with that which the many assert. But if the latter are associated with other proofs bearing upon the point derived from other persons, stronger than any proofs which can be connected with the contradiction of them, we have a rule to guide us in our estimate of both, making the many prevail over the one, though it might, independently of all other proof connected with either, bring us to an opposite conclusion. The testimony of De la Croix cannot stand the test of this rule. Setting aside all that the other witnesses say contrary to it, there is the oath of one witness who swears to the marriage, which raises an intendment of legitimacy in the offspring conclusive until it has been disproved. Against such a rule, suspicions or doubts not resting upon proofs as strong as the proofs of the marriage must not be indulged. But for a brief illustration of the rule, let us take the case. De la Croix says Mr. Clark told him, upon the only occasion he ever spoke to him of Myra, that she was his natural child. Madame Despau says she was present at the marriage of Mr. Clark to the mother of Myra. Bois Fontaine says Mr. Clark said to him, speaking of the mother of Mrs. Gaines, that he would have made his marriage with her public, but for her subsequent connection with Gardette. Now where is the weight of proof? Does De la Croix's testimony exceed that of the witness who swears to the marriage, and also Clark's declaration to Bois Fontaine admitting it? The contrary declarations may neutralize each other, in this aspect of the case, without lessening the positive.

In such a case, we have not a choice of conclusions, but must take that which the positive proves.

Hitherto, the testimony of De la Croix has been treated as if it was altogether unexceptionable. It is not so. There is in it that cold hardness of a man of the world, unmindful of the relations of former friendship whilst professing to regard them, but little in unison with kindness, and not at all so with the seriousness of exact truth. Such men will not swear to

what is false, but they may speak what is not true, by an indifference to exactness in what they do say. De la Croix's testimony is twice in the record, taken at different times, and we have it both in French and English. No injustice is done him by translation. They are not so contradictory of each other as to justify of themselves any charge against his intentional veracity; but they differ in particulars about Myra, as well as of other persons, so as to make it right that it should, as a whole, be received with great caution. Besides, for there must be no disguise of the facts which bring us to our conclusion concerning his testimony, there is upon the record a pecuniary relation between himself and the estate of Daniel Clark, which, unexplained, does not leave a favorable impression of his impartiality in this affair.

Again, suppose the fact of legitimacy in this case had been placed altogether upon the evidence of Belle Chasse and De la Croix, that of the former would not have been proof of it. But if Belle Chasse's testimony is fortified by that of others, speaking as strongly as he does of Clark's declarations of his daughter's legitimacy, it would not be reasonable to discard it for the testimony of De la Croix, which is unsupported by any other witness. Is the conclusion one less of proof, because Colonel and Mrs. Davis, who reared the child at the request of her father, were ignorant of his marriage? because Mr. Coxe and Mr. Hulings, who knew him well, say that they knew nothing of Mr. Clark's marriage, the two last declaring so to the best of their belief? All of this is negative testimony, implying ignorance of the fact of which they speak, and not knowledge of it, — a fact susceptible of positive proof, or of proof by facts from which marriage may be inferred. The rest of the testimony of Mr. Coxe, Mr. Hulings, and De la Croix, in respect to the marriage, is excluded from our consideration, from not being within the rules by which hearsay is admissible in cases of pedigree. Neither of them relate any thing as coming from the parents of Myra, or the relations on either side of the marriage. The only point in which the testimony of Mr. Coxe differs from that of Madame Despau is in his narrative of the arrangement made by him, at the request of Mr. Clark, for the birth of Caroline, now Mrs. Barnes. Madame Despau says she was the child of De Grange; Mr. Coxe, that Clark told him that she was his child. These declarations are at variance with each other as to the fact, but not contradictory. The fact may be as one or the other witness has related it. The difference, therefore, does not at all discredit Madame Despau. But the ignorance of Colonel and Mrs. Davis of the marriage, in connection with the arrange-

ments which were made by them, at the request of its father, for the birth of the child, and the father's great confidence in them, it is said, is extraordinary and unaccountable. But is it not equally so, that, under such circumstances, he should not have communicated to them the reverse? The latter is ordinarily the usual confidence between the parties upon such occasions, and when it is not made, an inquiry suggests itself at once why it was not done. Its not having been done, though extraordinary, proves nothing either one way or the other; the mind is left to connect other facts with it, for the purpose of enabling us to conclude what inference can justly be made from such an incident, so much out of the way of the confidence between parties upon such occasions. There are no such facts in this case to aid such an objection. There are facts independent of it, which happened afterwards, which repel it.

The witnesses speak of the extraordinary affection manifested by Mr. Clark for this child, — his daily visits, parental and endearing fondness, — his costly presents and manifested pride in her, as time developed her mind and appearance, — and that he always called her Myra Clark. All of this is not inconsistent with what men of generous temper will and should do to repair as much as they can, in such cases, their indiscretion as to the birth of a child. But when a parent does it, with subsequent declarations, made over and over again, to several persons, of a child's legitimacy, they may well be united with the latter to remove the objection, that Mr. Clark had not mentioned his marriage to Colonel and Mrs. Davis. Besides, let it be remembered that the evidence shows, up to that time, he had mentioned his marriage to no one. Madame Despau, his wife, and himself only knew the secret, and his influence over them made it his own, until they could speak free from the apprehensions excited in them by his declaration, that the marriage was not to be disclosed until the marriage with De Grange had been judicially annulled. He was a man of no ordinary character or influence upon those who were about him. His natural fitness to control became habitual, as his wealth and standing increased, and it was exercised and involuntarily yielded to by all who associated or who were in business with him. He was a man of high qualities, but of no rigor of virtue or self-control; — energetic, enterprising, courageous, affectionate, and generous, but with a pride which had yielded to no mortification until his affection subdued it to a sense of justice in behalf of his child. As to Mrs. Clark's subsequent connection with Gardette whilst she was the wife of Mr. Clark, considering it alone or with those reasons which

.have been urged against the fact of that marriage, our conclusion is, that, inexcusable as her conduct was, there is not enough to make the fact of the marriage with Mr. Clark doubtful. Discarding from our consideration altogether the irritation and impositions to which this female had been subjected from her girlhood, and her well-founded fears of the fidelity of Mr. Clark, and admitting she was very deficient in her apprehension of the sacredness of marriage, however much it may expose her virtue and her affection for her lawful husband to conclusions against both, we do not deem it to be a fact strong enough to set aside the testimony of one witness who swears positively to her marriage with Mr. Clark, and all the corroborating proof of that fact in the case. It will raise a suspicion against the marriage, in this most curious and original chapter of domestic life, not easily removed from the minds of those who indulge it. But we cannot permit it to prevail over the legitimacy of her child, established, as we think ourselves obliged to say it has been, in conformity with those rules of evidence which long experience and the wisdom of those who have gone before us in courts of equity have deemed the best to ascertain, in cases of doubt, the affinity and blood-relationship of social life.

But it is still said, admitting the marriage with Clark to have taken place in Philadelphia, that Mrs. Gaines cannot inherit from her father, his marriage with her mother being void, on account of her previous marriage with De Grange.

This will depend upon the marriage with De Grange having been a valid marriage. Or upon its being void for one of those causes which disable persons from contracting marriage. The burden of proof in such a case is not upon the party asserting the validity of the second marriage, but on the other, who asserts its invalidity on account of the validity of the first. Both are affirmative declarations. *Ei incumbit probatio qui dicit, non qui negat.* The argument is, the marriage with De Grange stands in the way of any right of Mrs. Gaines to inherit from her father, until the record of the conviction of De Grange for bigamy has been produced. We do not understand the law to be so. A bigamist may be proved so, in a civil suit, by any of those facts from which marriage may be inferred. Reputation of marriage is not enough, but facts from which it may be inferred are so. In a prosecution for the offence, there must be proof of an actual marriage. The confession of the bigamist will be sufficient in a civil suit, when made under circumstances which imply no objection to it as a confession. De Grange did make such a confession. Madame Benguerel says, in answer to the seventh interrogatory put to her, — "My

husband and myself were very intimate with De Grange, and
when we reproached him for his baseness in imposing upon
Zuline, he endeavoured to excuse himself by saying, that, at the
time of his marrying her, he had abandoned his lawful wife,
and never intended to see her again." Record, 212. And her
answer to the cross-interrogatory is, — "I am not related to
nor connected with the defendants, nor with either of them, nor
with the mother of the said Myra, nor am I interested at all in
this suit. It was in New Orleans where I obtained my infor-
mation. It will be seen by my answers how I knew the facts.
I was well acquainted with De Grange and the said Zuline,
and I knew the lawful wife of the said De Grange, whom he
had married previous to his imposing himself in marriage upon
Zuline." The credit of this witness is unassailed. Here,
then, is proof enough of a subsisting marriage between De
Grange and another female, when he married Mrs. Gaines's
mother, to invalidate the latter.

But suppose Madame Benguerel had not given such testi-
mony, or that her credit had been successfully assailed; what
would then be the state of the objection? Just this: as all the
other witnesses who speak of the prosecution of De Grange
for bigamy speak of his conviction only as hearsay or common
report, the defendant cannot call upon the plaintiff for record
proof of it, without placing himself in the inconsistent atti-
tude of rejecting the hearsay to be proof of its existence, but
giving to him the right to call for its production. The testi-
mony of Madame Benguerel was introduced by the plaintiffs
without any obligation upon them to have done so. It estab-
lishes the fact of De Grange's previous marriage, for all the
purposes of this controversy. The denial, in the answer of the
defendant, that Mr. Clark was ever married, is the assertion of
a fact, of which the defendant cannot, in the nature of things,
have positive knowledge, and is therefore no more than a
declaration of his belief. One witness, therefore, overrules the
denial. But there is no force in this objection for another rea-
son. When, in the progress of a suit in equity, a question of
pedigree arises, and there is proof enough, in the opinion of the
court, to establish the marriage of the ancestor, the presumption
of law is, that a child of the marriage is legitimate, and it will
be incumbent upon him who denies it to disprove it, though
in doing so he may have to prove a negative.

Further upon this point, the record of De Grange's convic-
tion cannot be called for, as there is proof that it could not be
found in the proper office in New Orleans, where it should be.
The complainants do not rely upon such proof to establish the
fact that De Grange was a married man when he married Zu-

line. His declaration to Madame Benguerel, associated with other facts, sufficiently proves it.

Before leaving this point, however, we will make a single remark upon what was said in the argument, that, if the record of De Grange's conviction had been produced, it would not have been competent testimony, from its being *res inter alios acta.*

The general rule certainly is, that a person cannot be affected, much less concluded, by any evidence, decree, or judgment, to which he was not actually, or in consideration of law, privy. But the general rule has been departed from so far as that wherever reputation would be admissible evidence, there a verdict between strangers, in a former action, is evidence also ; such as in cases of manorial rights, public rights of way, immemorial custom, disputed boundary, and pedigrees. Duchess of Kingston's case, 11 Howell, State Trials, 261 ; Davies, Demand., Lowndes, Tenant, 7 Scott, N. R. 141 ; Doe d. Bacon *v.* Brydges, 7 Scott, 333 ; Read *v.* Jackson, per Lawrence, J., 1 East, 355 ; Brisco *v.* Lomax, 8 Adol. & Ell. 198 ; Evans *v.* Rees, 10 Adol. & Ell. 151 ; Biddulph *v.* Ather, 2 Wel. 23 ; Tooker *v.* Duke of Beauford, 1 Burr. 146, as to manorial rights ; Brisco *v.* Lomax, 8 Adol. & Ell. 198, as to disputed boundary ; Laybourn *v.* Crisp, 4 Mees. & Wels. 320, as to questions of immemorial custom ; Travers *v.* Challoner, Gwill, 1237, as to disputed modus and pedigree ; Carr *v.* Heaton, Gwill, 1261. In Neal & Duke of Athol *v.* Wilding, Strange, 1157, the court rejected a special verdict in a former suit, the defendants not having been parties to that suit, which was offered to prove three of the descents which were necessary to make out the Duke's pedigree. Mr. Justice Wright differed from the majority of the judges on that occasion, and in Buller's N. P., 4th ed., p. 233, it is said that the opinion of that learned judge was generally approved, though the determination by the rest of the court was contrary. And the point has been since repeatedly ruled in conformity with the opinion of Mr. Justice Wright.

But it may be said that the real fact was not what our conclusion is upon this point. Let it be remembered by those who may say so, that possibilities are the enemies of truth, indicating more frequently than otherwise the unpreparedness of a mind to receive it, rather than its uncertainty. They have no standing in the law against a violent presumption, which is *plena probatio,* or full proof.

Having disposed of all the objections which were urged, or which can be raised upon this record, against the most interesting and essential fact in the case of the complainants, we

proceed to give our conclusions upon the legal points made for the reversal of the decree of the Circuit Court.

They were, that a suit at the instance of a forced heir cannot be maintained against a purchaser, until the donee's property has been discussed.

It was said the decree was not final.

That the statute of limitations barred a recovery.

And last, that the decree directs the property for which the defendant is sued to be conveyed and surrendered to Mrs. Gaines, instead of making it liable as a portion of Daniel Clark's estate, out of which the forced heir's *légitime* is to be calculated.

The first objection would prevail against the decree, if Mr. Patterson's was such a purchase. It is not so.

The defendant is the alienee of the purchasers who bought the property at auction, in the year 1820, from the executors of Mr. Clark under the will of 1811. It is admitted that the property was a part of Mr. Clark's estate when he died.

These sales were made without any authority, judicial or otherwise. They were made after the time when, by the law of Louisiana, the relation of the sellers as executors had expired. Nor can it be said they were legal on account of the power of attorney given to Mr. Relf and Mr. Chew by Mrs. Clark, the mother and universal legatee of the testator. She could give no power to the executors to dispense with the law prescribing the manner for making the sale of a succession. Her power of attorney was not of itself, nor was it treated by the executors, to make for her a legal acceptance of the succession. It was neither an express nor a tacit acceptance of the succession, casting upon her the responsibilities resulting to a donee of a succession by its acceptance. It might have been used as an act done by her from which her intention to accept the succession might have been inferred, which would have been a legal acceptance. But it was not so treated. Until the acceptance was made as the law required it to be, every act performed under it by the attorneys was void.

The power was also given when the possession of the estate was lawfully in the executor for the purpose of enabling them to discharge their functions according to law. It could not invest them with any power, either when their connection with the estate as executors existed, or afterwards, to sell any part of it in a way not permitted by the law.

One of the executors, Mr. Relf, received letters testamentary on the 27th August, 1813. The other, Mr. Chew, on the 21st January, 1814. Without delay, on the same day that he received letters, Mr. Relf applied for leave to sell the movable

and immovable property of his testator.   It was granted.   For reasons stated in a subsequent application, he applied for an extension of the order as to the time for making a sale.   It was allowed, without any alteration of the times for advertising the property he wished to sell, as fixed in the first order. The movable effects were to be advertised ten days.   The slaves and other immovable effects thirty days.   The defendant depends upon these orders for the regularity of the sales and the validity of the purchase made by his alienor, Correjollas, the original purchaser.   The sale of the property bought by Correjollas was made in 1820.   The time for making the sales, according to the order of the court, had passed more than six years.  The time within which the executors could act as such by the law of Louisiana had expired.   They had neither legal nor delegated authority from the donee of the estate, recognized as such by the law of Louisiana, to make the sale.   It was a sale without judicial order, — a sale in disregard of, and in violation of, the law, — one which the law of Louisiana makes absolutely void.   If considered as having been made under the orders for sale given by the court, it is also absolutely void.   It is necessary to show, in all cases of forced sales, meaning such as are done by judicial order, — particularly of the property of a succession, or estate of a deceased person, — that all the formalities of the law have been strictly complied with, or the sale will be annulled.   Delogny *v.* Smith, 3 Louis. R. 421; Donaldson *v.* Hull, 7 N. S. 113; Marsfield *v.* Comeaux, 7 N. S. 185; 8 N. S. 246; 4 Louis. R. 204; 11 Martin, 610, 675; 2 Louis. R. 328.

Under these decisions, and the view which we have taken of this point of the case, the fact of notice by the purchasers, and by the defendant from them, of the illegal and fraudulent sale, cannot be denied.   The defendant knew, from the titles which he received from the purchaser, Correjollas, and from that bought by him from the other alienee of Correjollas, that the sales had been made by Mr. Relf and Mr. Chew in a representative character, and it was his duty to inquire if they legally filled it.   Not having done so, he has bought in his own wrong, and the title by which he claims the property must be annulled.   We have confined our remarks strictly to the objection, that these sales were made by the donee, or universal heir of the will, without adducing other causes found in the proceedings of the executors, of which this record is but too fruitful, to show that the objection has no foundation in fact.

Of the statute of limitations we will only say, that the statute in force at the time the suit is brought determines the

right of the party to sue for a claim, and that the time under that in force when this suit was commenced had not expired. We ought, though, to say, to prevent future misapprehension, that it is not regularly in the pleading of this cause.

It is also said that the decree of the Circuit Court is not final, in the sense contemplated by the law, to give to this court appellate jurisdiction. Indeed, we do not see how a decree could be more so. Nothing is left open between the parties; it embraces the pleadings as well as the proofs in the cause, and directs the property held by the defendant, as it is set forth in the pleadings, to be conveyed and surrendered to Mrs. Gaines. And it is only because the decree is subject to the objection, that the *légitime* of Mrs. Gaines in her father's estate is to be calculated out of the whole of it, so as to ascertain and preserve distinct from the controversy the disposable *quantum* to which the donee is entitled under the will of 1811, that we shall direct it to be reversed.

Mrs. Gaines, as the forced heir of her father, is entitled to such a portion of his estate as he could not deprive her of, either by donations *inter vivos* or *mortis causa*. The will of 1811 is not null on account of its being a donation exceeding the *quantum* which the father could legally dispose of, but is only reducible to that *quantum*.

To determine the reduction to which the donation in the will of 1811 is liable, the 29th article of title 2d of donations *inter vivos* and *mortis causa*, ch. 3, sec. 2, of the code of 1808, gives the rule. The disposable *quantum* in this instance would be one fifth of the aggregate of the property of the decedent in Louisiana; the *légitime* four fifths. Code of 1808, 212, tit. 22.

We shall direct the decree of the court below to be reversed, and adjudge that a decree shall be made in the said court, in this suit, declaring that a lawful marriage was contracted in Philadelphia, Pennsylvania, between Daniel Clark and Zuline Carriere, and that Myra Clark, now Myra Gaines, is the lawful and only child of that marriage. That the said Myra is the forced heir of her father, and is entitled to four fifths of his estate, after the excessive donation in the will of 1811 is reduced to the disposable *quantum* which the father could legally give to others.

That the property described in the answer of the defendant, Mr. Patterson, is a part of the estate of Daniel Clark at the time of his death, that it was illegally sold by those who had no right or authority to make a sale of it, that the titles given by them to the purchaser and by the purchaser to the defendant, Mr. Patterson, including those given by the buyer

from the first purchaser to Mr. Patterson, are null and void, and that the same is liable, as a part of the estate of Daniel Clark, to the *légitime* of the forced heir, and that the defendant, Charles Patterson, shall surrender the same as shall be directed among other things to be done in the premises, as will appear in the decree and mandate of this court to the Circuit Court in Louisiana.

### Order.

This appeal having been heard by this court, upon the transcript of the record from the Circuit Court of the United States for the Eastern District of Louisiana, and upon the arguments of counsel, as well for the appellant as for the appellees, this court, upon consideration of the premises, doth now here adjudge, order, and decree, that the decree of the said Circuit Court be and the same is hereby reversed, with costs, and that such other decree in the premises be passed as is hereinafter ordered and decreed.

And this court, thereupon proceeding to pass such decree in this cause as the said Circuit Court ought to have passed, doth now here adjudge, order, and decree, that it be adjudged and declared, and is hereby adjudged and declared, upon the evidence in this cause, that a lawful marriage was contracted and solemnized at Philadelphia, in the State of Pennsylvania, between the same Daniel Clark, in the bill and proceedings mentioned, and the same Zuline or Zuliene Carriere, in the bill and proceedings mentioned; and that Myra Clark, now Myra Clark Gaines, and one of the complainants in this cause, is the lawful and only issue of the said marriage, and was at the death of her said father, Daniel Clark, his only legitimate child and heir at law, and as such was exclusively invested with the character of his forced heir, and entitled to all the rights of such forced heir.

And this court doth further adjudge, order, and decree, that all the property described and claimed by the defendant Patterson in his answer and supplemental answer, and in the exhibits thereto annexed, is part and parcel of the property composing the succession of said Daniel Clark: that the defendants Richard Relf and Beverly Chew, at the time and times when, under the pretended authority of the testamentary executors of the said Daniel Clark, and the attorneys in fact of the said Mary Clark in the will and proceedings mentioned, they caused the property so described and claimed by the defendant Patterson to be set up and sold at public auction, in December, 1820, and when they executed their act of sale, dated on the 18th February, 1821, to Gabriel Corre-

jollas for the two lots therein described, (which two lots constitute the same property described and claimed by the defendant Patterson as aforesaid,) had no legal right or authority whatever so to sell and dispose of the same, or in any manner to alienate the same; that the said sale at auction and the said act of sale to Correjollas in confirmation of the previous sale at auction, were wholly unauthorized and illegal, and are utterly null and void; and that the defendant Patterson, at the time and times when he purchased the property so described and claimed by him as aforesaid, (part from the said Correjollas, the vendee of the defendants Relf and Chew, and the residue from Etienne Meunier, the vendee of said Correjollas, himself the vendee of the same defendants,) was bound to take notice of the circumstances which rendered the actings and doings of the said defendants in the premises illegal, null, and void; and that he ought to be deemed and held, and hereby is deemed and held, to have purchased the property in question with full notice that the said sale at auction under the pretended authority of the said defendants and their said act of sale to Correjollas were illegal, null, and void, and in fraud of the rights of the person or persons entitled to the succession of the said Daniel Clark.

And the said court doth further adjudge, order, and decree, that all the property claimed and held by the defendant Patterson as aforesaid now remains, unaliened and undisposed of, as part and parcel of the succession of the said Daniel Clark, notwithstanding such sales at auction and act of sale in the pretended right or under the pretended authority of the defendants Relf and Chew.

And the court doth further adjudge, order, and decree, that the complainant, Myra Clark Gaines, is justly and lawfully entitled, as the only forced heir of said Daniel Clark, to her *legitimate portion* of four fifths of the said succession, and to have four fifths of the property so claimed and held by the defendant Patterson, as aforesaid, duly partitioned, apportioned, and delivered or paid over to her, together with four fifths of the yearly rents and profits accruing from the same, since the same came into the said defendant's possession; and for which the said defendant is hereby adjudged, ordered, and decreed to account to the said complainant.

And the court doth now here remand this cause to the said Circuit Court for such further proceeding as may be proper and necessary to carry into effect the following directions; that is to say, —

1. To cause the said defendant Patterson forthwith to surrender all the property so claimed and held by him as afore-

said into. the hands of such curator, commissioner, or trustee as the said court may appoint for the purpose; whose duty it shall be, under the directions of the court, to manage the said property to the best advantage, till the whole matter and apportionment of the said two portions (being the said four fifths and one fifth) of the said property shall have been completed and finally liquidated, as a part of the succession of the said Daniel Clark, and in the mean time to collect and receive all the rents, issues, and profits of the same, and to account and bring the same into court, to be there apportioned and paid over, or in part retained for further directions.

2. To cause four fifths of the property so claimed and held by the defendant Patterson as aforesaid to be duly partitioned, appropriated, and delivered or paid over to the said complainant; and to retain the residue subject to further directions for the appropriation of the same; which either party shall be at liberty to move for; and if the same be proved and found indivisible by its nature, or cannot be conveniently divided, to cause it to be sold by public auction, after the time of notice and advertisements, and as near as may be in the manner prescribed by law in the judicial sale of the property of successions: and, in case of such sale by auction, to apportion and pay over four fifths of the net proceeds of such sale to the said complainant, and to retain the residue subject to further directions, as aforesaid.

3. To cause an account to be taken by the proper officer of the court, and under the authority and direction of the court, of the yearly rents and profits accrued and accruing from the said property since it came into the possession of the defendant Patterson; and four fifths of the same to be accounted and paid to the said complainant, and the residue to be retained subject to such further directions as aforesaid.

4. To give such directions and make such orders, from time to time, as may be proper and necessary for carrying into effect the foregoing directions, and for enforcing the due observance of the same by the parties and the officers of the court.